**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MICHAEL GRIBE, derivatively on behalf of VESTIS CORPORATION,<br><br>Plaintiff,<br><br>vs.<br><br>KIMBERLY SCOTT, RICK DILLON, PHILLIP HOLLOMAN, RICHARD BURKE, WILLIAM W. GOETZ, TRACY JOKINEN, LYNN MCKEE, KEITH A. MEISTER, DOUG PERTZ, MARY ANNE WHITNEY, and ENA WILLIAMS,<br><br>Defendants,<br><br>and<br><br>VESTIS CORPORATION,<br><br>Nominal Defendant. | Case No. 1:25-cv-06234<br><br>**DEMAND FOR JURY TRIAL** |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**INTRODUCTION**

Plaintiff Michael Gribe ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Vestis Corporation ("Vestis" or the "Company"), files this Verified Shareholder Derivative Complaint against Kimberly Scott ("Scott"), Rick Dillon ("Dillon"), Phillip Holloman ("Holloman"), Richard Burke ("Burke"), William W. Goetz ("Goetz"), Tracy Jokinen ("Jokinen"), Lynn McKee ("McKee"), Keith A. Meister ("Meister"), Doug Pertz ("Pertz"), Mary Anne Whitney ("Whitney"), and Ena Williams ("Williams") (collectively, the "Individual Defendants," and together with Vestis, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Vestis, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Section 14(a) of the

Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution against Defendants Scott and Dillon under Sections 10(b) and 21D of the "Exchange Act." As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Vestis, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by Vestis's directors and officers from May 2, 2024 to May 6, 2025, both dates inclusive (the "Relevant Period").

2. Vestis is a major distributor of workplace supplies, notably uniform rentals, throughout the United States and Canada. Vestis is the product of a September 2023 separation by Aramark, a global provider of food and facilities services, of its Aramark Uniform Services ("AUS") segment into an independent public company (the "Spinoff"). The Spinoff became complete on September 30, 2023, and Vestis's common stock began to trade on the New York Stock Exchange ("NYSE") on October 2, 2023. Although becoming an independent company following the separation, Vestis engaged in several agreements regarding subsequent related party transactions and investments in connection with the Spinoff. Currently, the Company services over 300,000 customer locations.

3. Vestis's chief products are uniforms, towels, restroom supplies, and first-aid supplies, among other things. Further, the Company operates its own laundry plants, satellite plants, distribution centers, and manufacturing plants numbering over 350 total sites. The Company's primary customer base is recurring generally on a weekly basis, and often utilizes multi-year contracts. In the fiscal year ended September 27, 2024 (the "2024 Fiscal Year"), the Company reported revenue generation of roughly $2.8 billion.[1]

4. Throughout the Relevant Period, Defendants made numerous representations to investors concerning the Company's financial expectations in the 2025 Fiscal Year. Defendants consistently touted their predictions for Vestis, as well as their corporate strategies. Defendants' corporate strategies included, *inter alia*, the Company's initiatives to increase prices annually while simultaneously increasing customer retention. For instance, Defendant Scott stated on an earnings call on May 2, 2024 (the "2QFY24 Earnings Call") that the Company "***. . . will continue to strategically and surgically price in a thoughtful way with focus on lifetime customer value. [The Company] believe[s] service gaps have driven price sensitivity as fully satisfied customers typically don't leave because they've received a price increase***."[2]

5. Defendants thus conveyed to investors the Company's ability to drive growth through customer retention, increased revenue from repeating customers, and notably the Company's guidance for the 2025 Fiscal Year. In doing so, Defendants concealed the true nature of the Company's financial trajectory, namely that the Company would be unable to drive growth in the manners referenced above.

[1] Notably, the Company does not operate on a calendar year. Instead, Vestis operates on a 52-week or 53-week fiscal year which ends on the Friday nearest to September 30th.
For the fiscal year from September 28, 2024 until October 3, 2025, the "2025 Fiscal Year."
[2] Unless otherwise stated, all emphasis is added.

6. On May 7, 2025, the truth emerged when the Company hosted an earnings call to regarding its financial results for the second quarter of the 2025 Fiscal Year (the "2QFY25 Earnings Call"). On the 2QFY25 Earnings Call, it was revealed that second quarter revenue declined by abut $18 million from the first quarter. In addition, it was also revealed that the Company's guidance was being withdrawn pertaining to revenue and growth in the full 2025 Fiscal Year. The 2QFY25 Earnings Call also revealed a new guidance for the third quarter of the 2025 Fiscal Year which fell substantially below market expectations.

7. Statements made on the 2QFY25 Earnings Call cited as reasons for the Company's unsatisfactory financial results "lower adds over stops, which is how [the Company] describe[s] volume changes with our existing customers[,]" and to a lesser extent "lost business in excess of new business[.]" Moreover, the Company's recission of its full year 2025 guidance and subsequently lackluster third quarter 2025 guidance was due to the "increasingly uncertain macro environment."

8. On this news, the Company's stock price fell $3.27 per share, or roughly 37.5%, from a closing price of $8.71 per share on May 6, 2025 to close at $5.44 per share on May 7, 2025.

9. Throughout the Relevant Period, the Individual Defendants made materially false and/or misleading statements and failed to disclose material adverse facts about Vestis's business, operations, and prospects. In particular, the Individual Defendants failed to disclose to shareholders and investors that: (1) the risks associated with seasonality and macroeconomic shifts were substantially greater than represented; (2) the Company's anticipated growth and projected revenue were overstated; and (3) as a result the Company's guidance for the 2025 Fiscal Year was substantially overstated. In light of the above, the Individual Defendants' statements about the

Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

10. In light of the Individual Defendants' misconduct—which has subjected the Company and various of its current and former officers and directors to a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of New York (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

11. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of the officers' and directors' liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange

Act (15 U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

13. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

14. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

15. Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

16. Plaintiff is a current shareholder of Vestis. Plaintiff has continuously held shares of Vestis common stock at all relevant times.

### Nominal Defendant Vestis

17. Vestis is a Delaware corporation with principal executive offices at 500 Colonial Center Parkway, Suite 140, Roswell, Georgia. Vestis common stock trades on the NYSE under the ticker symbol "VSTS."

### Defendant Scott

18. Defendant Scott served as Vestis's President and Chief Executive Officer ("CEO") and as a Company director from the Spinoff until March 18, 2025. Previously, she served as President and CEO of Aramark's AUS segment from October 2021 until the Spinoff.

19. The proxy statement filed with the SEC on December 21, 2024 (the "2024 Proxy Statement") stated the following about Defendant Scott:

> Ms. Scott serves as the President and Chief Executive Officer of Vestis. She joined Aramark in October 2021 to serve as President and Chief Executive Officer of Aramark Uniform Services and to prepare Vestis to be a standalone, independent public company. Previously, Ms. Scott served as Chief Operating Officer of Terminix Global Holdings, Inc. (NYSE: TMX) from January 2021 to September 2021, overseeing operations for both the residential and commercial businesses, after having served as President of Terminix Residential from December 2019 to January 2021. Prior to Terminix, she served as President of Rubicon Global from July 2018 to September 2019, a role that followed an 11-year career at Brambles Limited, which culminated in Ms. Scott serving as President, CHEP North America for four years. Early in her career, Ms. Scott gained industrial manufacturing experience at the General Electric Company (NYSE: GE) and U.S. Steel (NYSE: X). She serves as a member of the board of directors for Greif, Inc. (NYSE: GEF).

**<u>Defendant Dillon</u>**

20. Defendant Dillon has served as Vestis's Executive Vice President and Chief Financial Officer ("CFO") from the Spinoff until February 14, 2025. Previously, he served as CFO of Aramark's AUS segment from May 2022 until the Spinoff.

21. The 2024 Proxy Statement stated the following about Defendant Dillon:

> Rick Dillon, 53, serves as an Executive Vice President and the Chief Financial Officer of Vestis. Mr. Dillon joined Aramark in May 2022 to serve as Chief Financial Officer of Aramark Uniform Services and to prepare Vestis to be a standalone, independent public company. Prior to joining Aramark, Mr. Dillon served as Executive Vice President and Chief Financial Officer of Enerpac Tool Group (NYSE: EPAC) from December 2016 to April 2022. In addition to his experience at Enerpac, Mr. Dillon served as Executive Vice President and Chief Financial Officer at Century Aluminum (NASDAQ: CENX) for approximately three years. Prior to that, he held progressive leadership roles at publicly traded companies in finance and accounting, including Joy Global, Newell Brands, and Briggs and Stratton, and in public accounting. He also serves as a member of the board of directors of Adient plc (NYSE: ADNT).

**<u>Defendant Holloman</u>**

22. Defendant Holloman has served as a Company director and as the Chairman of the Board since the Spinoff. Defendant Holloman served as interim Executive Chairman, President and CEO from March 18, 2025 to June 2, 2025. Defendant Holloman also serves as a member of the Board's Nominating, Governance, and Corporate Responsibility Committee, but stepped down

from his committee position for the period in which he served as interim Executive Chairman, President, and CEO.

23. The 2024 Proxy Statement stated the following about Defendant Holloman:

> Mr. Holloman retired from Cintas as president and chief operating officer in 2018. Other roles during his 22-year career with Cintas included rental division president and chief operating officer, senior vice president of global supply chain management, executive champion of Six Sigma Initiatives, vice president of distribution/production planning and vice president of engineering and construction. Mr. Holloman is a founding member of Cintas' diversity committee and received the Excalibur Award, the company's highest distinction reserved for business executives who demonstrate excellence during their tenure. He serves as a member of the board of directors for Pulte Group (NYSE: PHM) and the BlackRock Fixed Income Board and was previously a member of the board of directors for Rockwell Automation (NYSE: ROK). In addition, Mr. Holloman serves on the board of trustees for the University of Cincinnati.

**<u>Defendant Burke</u>**

24. Defendant Burke has served as a Company director since the Spinoff. Defendant Burke also serves as the Chair of the Board's Nominating, Governance, and Corporate Responsibility Committee and as a member of the Compensation and Human Resources Committee.

25. The 2024 Proxy Statement stated the following about Defendant Burke:

> Mr. Burke previously served as chairman of the board and chief executive officer of Advanced Disposal Services, Inc. (NYSE: ADSW), an integrated environmental services company, from 2012 to 2020. Prior to that role, he served as president and chief executive officer of Veolia Environmental Services North America Corp., a solid waste and hazardous waste management company, from 2009 to 2012, and as president of Veolia ES Solid Waste, from 2007 to 2009. Mr. Burke currently serves on the board of U.S. Infrastructure Company, an underground utility locating business owned by Partners Group, and Biffa, a U.K. waste and recycling business owned by Energy Capital

**<u>Defendant Goetz</u>**

26. Defendant Goetz has served as a Company director since August 3, 2024. Defendant Goetz currently serves as a member of the Nominating, Governance, and Corporate Responsibility Committee.

27. The 2024 Proxy Statement stated the following about Defendant Goetz:

> Mr. Goetz served as President and Chief Executive Officer for DYMA Brands, a leading manufacturer to the foodservice industry, from 2020-2024. Prior to that, he served as President and COO of Carriage Services, held roles of increasing responsibility at Sysco Corporation, including Senior Vice President of Sales and Marketing and Chief Marketing Officer. Additionally, he spent 22 years at Cintas Corporation in various executive leadership roles, including President and COO of Global Accounts and Strategic Markets and Chief Marketing Officer. Mr. Goetz currently serves as a National Trustee of the Boys & Girls Club of America.

**Defendant Jokinen**

28. Defendant Jokinen has served as a Company director since the Spinoff. Defendant Jokinen also serves as the Chair of the Board's Audit Committee and as a member of the Compensation and Human Resources Committee.

29. The 2024 Proxy Statement stated the following about Defendant Jokinen:

> Ms. Jokinen has over 30 years of finance and accounting experience across various global industries, where she focused on accelerating profitable growth and business transformation in her role as chief financial officer for both public and private companies. Most recently, Ms. Jokinen was executive vice president and chief financial officer of Vyaire Medical, a medical device company, from March 2020 to January 2022. She previously held the role of executive vice president and chief financial officer at Acelity, from June 2017 until it was acquired by 3M (NYSE: MMM) in October 2019. She also served as chief financial officer of G&K Services, a publicly traded uniform services company, from 2014 until it was acquired by Cintas (NDAQ: CINTAS) in 2017. Ms. Jokinen currently sits on the board of directors at Alamo Group (NYSE: ALG), Array Technologies (NDAQ: ARRY), and Candela Corporation.

**Defendant McKee**

30. Defendant McKee has served as a Company director since the Spinoff. Previously, Defendant McKee served as executive vice president and chief human resources officer for Aramark from 2004 until 2022.

31. The 2024 Proxy Statement stated the following about Defendant McKee:

> Ms. McKee most recently served as executive vice president and chief human resources officer for Aramark from 2004 to 2022. Prior to this role, Ms. McKee held several key positions for Aramark from 1980 to 2004, including director of employee relations, vice president for corporate human resources, where she was responsible for executive development and compensation, and senior vice president for human resources of Aramark Global Food, Hospitality and Facility Services. In addition, Ms. McKee led Aramark's corporate communications, diversity, equity and inclusion, sustainability, community relations, corporate real estate and air and meeting services. Ms. McKee is currently a member of the board of directors of WSFS Financial Corporation (NASDAQ: WSFS) and Highmark Health, Inc.

**Defendant Meister**

32. Defendant Meister has served as a Company director since June 18, 2024. Defendant Meister currently serves as a member of the Audit Committee.

33. The 2024 Proxy Statement stated the following about Defendant Meister:

> Keith Meister is the founder, Managing Partner and Chief Investment Officer, Corvex Management LP since 2010. Prior to founding Corvex, he served as Chief Executive Officer and then Principal Executive Officer and Vice Chairman of the Board of Icahn Enterprises from August 2003 to August 2010. From its launch in November 2004 to August 2010, he also served as Senior Managing Director of the General Partners of Icahn Partners LP and affiliated funds. Prior to joining the Icahn Organization, Meister served as Co-President of J Net Ventures from January 2000 through September 2001. Prior to launching J Net Ventures, he worked at NorthStar Capital and Lazard Freres. Mr. Meister currently serves as a director on the boards of GeneDx Holdings Corp. and MGM Resorts International, and previously served on the boards of Yum! Brands, Inc., The Williams Companies, the ADT Corporation, and Ralcorp Holdings, among others.

**Defendant Pertz**

34. Defendant Pertz has served as a Company director and as the Vice Chairman of the Board since the Spinoff. Defendant Pertz also serves as the Chair of the Board's Compensation and Human Resources Committee and as a member of the Audit Committee.

35. The 2024 Proxy Statement stated the following about Defendant Pertz:

> Mr. Pertz previously served as the executive chairman of the board of The Brink's Company (NYSE: BCO), a global leader in total cash management and secure logistics, until his retirement in May 2023. Mr. Pertz also served as the president,

> chief executive officer and a member of the board of The Brink's Company from June 2016 to May 2022. Prior to Brink's, he served as president and chief executive officer of Recall Holdings, having led Recall from its initial public offering in 2013 to the strategic sale of the business in 2016. He previously also served as chief executive officer of several other public companies, including IMC Global (predecessor to Mosaic Co. (NYSE: MOS)) and Culligan Water Technologies. Mr. Pertz currently serves on the board of directors for Advance Auto Parts (NYSE: AAP) and Vital Records Control.

**<u>Defendant Whitney</u>**

36. Defendant Whitney has served as a Company director since the Spinoff. Defendant Whitney also serves as a member of the Audit Committee.

37. The 2024 Proxy Statement stated the following about Defendant Whitney:

> Ms. Whitney has served as executive vice president and chief financial officer of Waste Connections (NYSE: WCN) since February 2021 and has more than 25 years of deep financial expertise. During her 17-year tenure at Waste Connections, Ms. Whitney has held executive-level finance roles, each with increased responsibilities, including senior vice president and chief financial officer from July 2018 to February 2021, senior vice president of finance, vice president of finance and director of finance. Previously, Ms. Whitney held various finance positions at Wheelabrator Technologies.

**<u>Defendant Williams</u>**

38. Defendant Williams has served as a Company director since the Spinoff. Defendant Williams also serves as a member of the Compensation and Human Resources Committee and the Nominating, Governance, and Corporate Responsibility Committee.

39. The 2024 Proxy Statement stated the following about Defendant Williams:

> Ms. Williams has served as chief operating officer of Casey's General Stores (NASDAQ: CASY), one of the leading convenience store chains in the United States, since June 2020. She is responsible for store operations, supply chain, fuel operations, real estate, procurement and construction and maintenance. Prior to this role, Ms. Williams served as the chief executive officer and member of the board of directors of National HME, a technology enabled medical equipment provider, from January 2019 to March 2020. Ms. Williams also served as senior vice president and head of international operations for 7-Eleven, where she led the global growth strategy and had profit and loss responsibilities. Ms. Williams also held several positions in operations, retail, finance and planning for Mobil Oil

Corporation and ExxonMobil Corporation (NYSE: XOM). Ms. Williams currently serves on the board of advisors for the Robert B. Rowling Center for Business Law and Leadership, at the SMU Dedman School of Law. She also serves on the board of directors for Children International and on the Dallas leadership committee for St. Jude.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

40. By reason of their positions as officers, directors, and/or fiduciaries of Vestis and because of their ability to control the business and corporate affairs of Vestis, the Individual Defendants owed Vestis and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Vestis in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Vestis and its shareholders so as to benefit all shareholders equally.

41. Each director and officer of the Company owes to Vestis and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

42. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Vestis, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

43. To discharge their duties, the officers and directors of Vestis were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

44. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The

conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Vestis, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Vestis's Board at all relevant times.

45. As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

46. To discharge their duties, the officers and directors of Vestis were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Vestis were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent

manner in accordance with the laws and regulations of Delaware, Georgia, and the United States, and pursuant to Vestis's own Business Conduct Policy (the "Code of Conduct") and Code of Ethics for Senior Financial Officers (the "Code of Ethics");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Vestis conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Vestis and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Vestis's operations would comply with all applicable laws and Vestis's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

47. Each of the Individual Defendants further owed to Vestis and the shareholders the duty of loyalty requiring that each favor Vestis's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

48. At all times relevant hereto, the Individual Defendants were the agents of each other and of Vestis and were at all times acting within the course and scope of such agency.

49. Because of their advisory, executive, managerial, directorial, and controlling positions with Vestis, each of the Individual Defendants had access to adverse, non-public information about the Company.

50. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Vestis.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

51. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

52. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants'

violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

53. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Vestis was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

54. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

55. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Vestis and was at all times acting within the course and scope of such agency.

**VESTIS'S CODE OF CONDUCT AND CODE OF ETHICS**

***Code of Conduct***

56. Vestis's Code of Conduct represents that it "supports [Vestis's] commitment to earn [] trust and helps guide us to ensure our actions reflect the highest standards of integrity. The [Code of Conduct] applies to all of us-including teammates, senior leaders, our board of directors, and anyone acting on Vestis's behalf. Each of us is responsible for protecting Vestis's integrity and reputation."

57. In the section, "The BCP Applies to Everyone" the Code of Conduct in relevant part, states:

> THOSE WHO FAIL TO COMPLY with the BCP, fail to disclose suspected violations, fail to cooperate with an investigation of a possible violation, or knowingly make a false report may be subject to disciplinary action up to and including termination of employment.

58. In the section "Compliance with the Laws" the Code of Conduct states:

> It is Vestis's policy to comply with the laws in each country, state, and locality in which Vestis conducts business. This includes, but is not limited to, compliance with employment, labor, and workplace rules; data privacy, cybersecurity, environmental, antitrust, gifts and entertainment, and securities laws; and the United States Foreign Corrupt Practices Act, and other anticorruption/ anti-bribery laws. Every Vestis teammate and any person or entity acting on Vestis's behalf must adhere to the restrictions and standards imposed by those laws and regulations.

59. In the section "Accurate Books and Reporting" the Code of Conduct states:

> We must ensure that our books and records are complete, accurate, honest, and timely. You must never falsify, or ask or cause someone else to falsify, company books or records or customer documentation by making false entries through deliberate omission, or by creating records without knowledge of their accuracy. All expense reports, accounts payable, invoice transmittals, inventory summaries, customer billing data, payroll data, and any other similar documents or records must be complete, accurate, honest, and timely. You may not open or maintain any undisclosed or unrecorded corporate account, fund, or asset or any account with a misleading purpose.
> You must not provide false or misleading information to anyone, including the Vestis Legal Department, Vestis's Internal Audit Department, or our independent auditors.

***Code of Ethics***

60. Vestis's Code of Ethics is intended "to promote honest and ethical conduct, and adherence with the law." The Code of Ethics "applies to the Corporation's principal executive officer, principal financial officer, principal accounting officer and all Vice Presidents and above in the Corporate Finance and Corporate Accounting Departments (collectively the 'Senior Financial Officers')."

61. The Code of Ethics states that:

Senior Financial Officers shall:

- Engage in and promote honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

- Produce, or cause to be produced, full, fair, accurate, timely, and understandable disclosure in reports and documents that the Corporation files with, or submits to, the Securities and Exchange Commission and in other public communications made by the Corporation;

- Comply with applicable governmental laws, rules and regulations, as well as the rules and regulations of self-regulatory organizations applicable to the Corporation;

- Take all reasonable measures to protect the confidentiality of the Corporation's non-public information and that of its customers obtained or created in connection with their activities and to prevent the unauthorized disclosure of such information unless required by applicable law or regulation or for legal or regulatory purposes;

- Promptly report violations of this Policy as provided below; and

- Be held accountable for adherence to this Policy.

62. In violation of the Code of Conduct and Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of the

Exchange Act, and the aiding and abetting thereof. Also, in violation of the Code of Conduct and Code of Ethics, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Conduct, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Codes of Conduct and Code of Ethics.

## VESTIS'S AUDIT COMMITTEE CHARTER

63. Vestis also maintains an Audit Committee Charter (the "Audit Committee Charter") which governs the Audit Committee's roles and responsibilities. The Audit Committee charter states the following regarding the purpose of the Audit Committee:

> The Audit Committee shall assist the Corporation's Board of Directors (the "Board") in its oversight of: the performance of the Corporation's internal audit function and the independent auditors; the accounting, reporting and financial practices of the Corporation, including the quality and integrity of the Corporation's financial statements, including internal controls; the qualifications and independence of the independent auditors; the Corporation's compliance with legal and regulatory requirements; risk assessment and management; and the Corporation's information technology ("IT") functions and security program. The Committee shall also prepare an audit committee report as required by the Securities and Exchange Commission (the "SEC") to be included in the Corporation's annual proxy statement.
>
> In fulfilling their responsibilities hereunder, it is recognized that members of the Committee are not, and do not represent themselves to be, accountants or auditors by profession or experts in the fields of accounting or auditing, including in respect of auditor independence. In addition, notwithstanding the Committee's purposes set forth above, the Committee is not responsible for certifying the Corporation's financial statements or guaranteeing the auditor's report. The fundamental responsibility for the Corporation's financial statements and disclosures rests with management. The Committee may carry out additional functions and adopt additional policies and procedures as may be appropriate in light of changing business, legislative, regulatory, legal or other conditions. The Committee shall also carry out any other responsibilities and duties delegated to it by the Board from time to time related to the purposes of the Committee set forth in this charter.

64. Under the heading "Functions, Powers and Responsibilities" in a subsection titled "Financial Reporting" the Audit Committee Charter states:

1.Meet to review and discuss with management and the independent auditors prior to public dissemination the Corporation's annual audited financial statements and quarterly financial statements, including: (A) the profit and loss statement, the balance sheet and statement of cash flows including variances and changes therein, (B) an analysis prepared by management and/or the independent auditor, setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, (C) the Corporation's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," including accounting policies that may be regarded as critical; and (D) major issues regarding the Corporation's accounting principles and financial statement presentations, including any significant change in the Corporation's selection or application of accounting principles and financial statement presentations; and receive reports from the independent auditors as required by SEC and/or Public Company Accounting Oversight Board (PCAOB) rules.

2. Review with management and discuss the Corporation's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies, including the type and presentation of information, paying particular attention to any pro forma or adjusted non-GAAP information. Such discussions may be in general terms (i.e., discussion of the types of information to be disclosed and the type of presentations to be made).

3. In consultation with the independent auditors, management and the internal auditors, review the Corporation's financial reporting processes and accounting standards and principles.

4. Review periodically the effect of regulatory and accounting initiatives, as well as off-balance sheet structures (if any), on the financial statements of the Corporation.

5. Review with the independent auditors and the Vice President, Internal Audit: (i) any audit problems or other difficulties encountered by the auditor in the course of the audit process, including any restrictions on the scope of the independent auditor's activities or on access to requested information, and any disagreements with management, and (ii) management's responses to such matters. Without excluding other possibilities, the Committee may wish to review with the independent registered public accounting firm (i) any accounting adjustments that were noted or proposed by such firm but were "passed" (as immaterial or otherwise), (ii) any communications between the audit team and the audit firm's national office respecting auditing or accounting issues presented by the engagement and (iii) any "management" or "internal control" letter issued, or proposed to be issued, by the independent registered public accounting firm to the Corporation.

6. Recommend to the Board whether the Corporation's annual financial statements should be included in the Annual Report on Form 10-K.

> 7. Review and approve all reports and disclosure with respect to matters related to the Committee required to be included in the Corporation's Form 10-K or proxy statement, as applicable, pursuant to applicable rules and regulations of the SEC.
>
> 8. Review with the General Counsel legal matters that may have a significant impact on the Corporation's financial statements.
>
> 9. Review any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal controls.

65. Under the same heading, in the subsection titled "Accounting Controls and Personnel" the Audit Committee Charter states:

> 1.Review the adequacy and effectiveness of the Corporation's internal controls over financial reporting, including any significant deficiencies or material weaknesses in and significant changes to internal controls reported to the Committee by the independent auditors or management. Review any special audit steps adopted in light of material control deficiencies and the adequacy of disclosures about changes in internal control over financial reporting.
>
> 2. Discuss with management and the independent auditors the Corporation's guidelines and policies with respect to risk assessment and risk management. While it is the responsibility of senior management to assess and manage the Corporation's exposure to risk, the Committee shall discuss the Corporation's major financial risk exposure and the steps management has taken to monitor and control such exposures, including without limitation insurance.
>
> 3. Periodically review, with the independent auditor, the internal audit function's responsibility, budget, staffing, the scope and results of internal auditing procedures, and performance. Annually review and recommend changes (if any) to the internal audit charter.
>
> 4. Review and concur on the appointment, compensation, removal and replacement of the Vice President, Internal Audit. The Vice President, Internal Audit shall report to the Committee and administratively to the Chief Financial Officer.
>
> 5. Set clear hiring policies for the Company's hiring of employees or former employees of the independent auditors. At a minimum, these policies must provide that any independent registered public accounting firm may not provide audit services to the Corporation if the CEO, controller, CFO, chief accounting officer or any person serving in an equivalent capacity for the Corporation was employed by the independent registered public accounting firm and participated in any capacity in the audit of the Corporation during the one-year period preceding the date of the initiation of the audit.

> 6. Review and evaluate the strategy with respect to and adequacy of the Corporation's IT functions and security program, compliance and controls. Review the Corporation's IT functions and security controls with management and, at least annually, with the Board.
>
> 7. Consider the risk of management's ability to override the Company's internal controls.
>
> 8. Review and assess the scope and readiness of the Company's business continuity plans.

66. Under the same heading in a subsection titled "Business Conduct and Ethics" the Audit Committee Charter states:

> 1. Establish procedures for: (i) the receipt, retention and treatment of complaints received by the Corporation regarding accounting, internal accounting controls or auditing matters; and (ii) the confidential, anonymous submission by employees of the Corporation of concerns regarding questionable accounting or auditing matters.
>
> 2. Monitor compliance with the Corporation's Business Conduct Policy and review and approve any requests for waivers of the Business Conduct Policy for executive officers and directors.
>
> 3. Establish, maintain and administer a policy with regard to related party transactions. Discuss with the independent registered public accounting firm its evaluation of the Company's identification of, accounting for, and disclosure of its relationships with related parties as set forth under the standards of the PCAOB.
>
> 4. Conduct investigations of allegations of management misconduct or other matters within the Committee's scope of responsibilities when deemed necessary or desirable.
>
> 5. Discuss with management the Corporation's guidelines and policies with respect to the use of artificial intelligence and associated risk management.

67. In violation of the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange

Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## THE INDIVIDUAL DEFENDANT'S MISCONDUCT

### Background

68. Vestis, headquartered in Roswell, Georgia, is the product of the Spinoff, which was the September 2023 separation by Aramark, a global provider of food and facilities services, of its AUS segment into Vestis, an independent public company. Vestis focuses primarily on the production, sale, and delivery of workplace supplies. Among other things, the Company offers uniforms, towels, and various restroom and first-aid supplies. A significant portion of the Company's customer base consists of repeating customers who sign contracts with lengthy durations.

69. Vestis is a "route-based business" focused on the business-to-business market. The route-based business dispatches delivery drivers from one of the Company's laundry plants or "market centers" to deliver the Company's services and products to customers.

70. Vestis's primary customer bases consist the following sectors: manufacturing, hospitality, retail, food processing, automotive and healthcare.

71. In the 2024 Fiscal Year, the Company reported revenue generation of roughly $2.8 billion, as well as operating income of $158 million (roughly 5.6% of revenue) and a net income of $21 million (roughly 0.7% of revenue). With regard to macroeconomic trends, the Company's Annual Report on Form 10-K filed with the SEC for the 2024 Fiscal Year (the "2024 10-K") stated that ". . . the diversity of our customer base and the variety of industries in which our customers

participate results in relatively low exposure to discrete industry trends." On a geographic basis, roughly 91% of the Company's revenue in the 2024 Fiscal Year derived from sales within the United States while roughly 9% of the Company's revenue in the 2024 Fiscal Year derived from sales in Canada.

72. On January 31, 2025, the Company announced the departure of Defendant Dillon from his position as Executive Vice President and CFO of Vestis. Defendant Dillon's departure went into effect on February 14, 2025. In announcing Defendant Dillon's departure, Defendant Scott stated:

> Additionally, we announced that our Chief Financial Officer, Rick Dillon, will be leading [sic] the company as a part of the transition of the CFO role. I want to sincerely thank Rick for his significant contributions to Vestis. His leadership in preparing for Vestis' separation as a stand-alone public company and building out our public company finance capabilities will have a lasting positive impact on our company. We remain grateful for his service to the company, and we wish him continued success.
>
> I'm also excited to announce that Kelly Janzen will be joining Vestis as our new CFO. Kelly has over 25 years of financial leadership experience. And since October, she has been supporting us as a finance consultant. Previously, Kelly worked in the industrial distribution space as the CFO of BlueLinx from 2020 to 2023. Kelly brings a tremendous skill set, particularly in financial and business process optimization. And under her proven leadership, we believe we will be able to significantly advance our finance organization in support of future value creation.

73. On March 18, 2025, the Company announced the departure of Defendant Scott from her positions as President and CEO of Vestis, effective on the same date. Defendant Scott also left her position as a Company director effective March 18, 2025. The press release announcing Defendant Scott's departure stated that "the Board of Directors of Vestis Corporation … determined that Kim Scott, President and Chief Executive Officer, will leave her positions with the Company effective March 18, 2025. Ms. Scott also resigned from the Company's Board of Directors on March 18, 2025." The press release also announced Defendant Holloman would be

taking over as interim Executive Chairman, President, and CEO until a new CEO could be appointed.

**False and Misleading Statements**

***May 2, 2024 Press Release and Earnings Call***

74. On May 2, 2024, the Company issued a press release concerning its financial results for the second quarter of the 2024 Fiscal Year (the "2QFY24 Press Release").

75. During the 2QFY24 Earnings Call later that day, Defendant Scott detailed strategic "corrections" the Company was making, and explained that the Company was "not satisfied with our performance and this outlook for the full year" at the time. In pertinent part, Defendant Scott discussed such "strategic initiatives," stating:

> We are delivering results against many of our key strategic initiatives while taking swift and assertive action to enhance our sales productivity and service efficacy to accelerate growth. We are also keenly focused on managing and reducing costs across the company.
>
> . . .
>
> We are taking decisive and immediate actions to address our short-term challenges in the year. ***We are mobilized to improve sales productivity related to new business wins and focus on building a high-performing sales team***. I have spent significant time over the past few months assessing our sales team, structure and talent as well as our processes from teammate training and onboarding to collateral and go-to-market strategies for our various product lines. ***We've identified enhancing selling skills and capabilities as well as improving teammate tenure as our highest priorities to support our frontline sales teammates in improving their close rates and deal sizes.*** In support of this, we have launched improved recruiting, onboarding and retention programs as well as enablement tools such as improved collateral and sample kits. We are also strengthening our national account pipeline.
>
> I have spent a great deal of time with our national account sales leaders and our customers. It's a privilege to support so many great companies and brands. Not only do we have opportunity to win new national accounts but we have opportunity to grow share of wallet with existing customers. Our national account team is energized by the support and focus they are receiving from leadership to grow national accounts as this has not been a priority for past leadership. ***We are taking actions to enhance our service in order to deliver a higher level of customer***

> ***satisfaction, loyalty and retention***. This effort will also allow us to revisit pricing as we see customers respond positively to these process improvements.
>
> We are conducting assessments all the way to our route service representatives in the field to identify, improve and retrain on specific procedures that can enhance our customers' experience and garner loyalty. We will also be creating a new leadership role on our team that will be accountable for service across the company. ***While we work through these improvements, we have deliberately moderated planned price increases we had scheduled for the second quarter and in the second half of the year in order to reduce customer churn***, with a focus on improving customer lifetime value while we enhance our service processes.
>
> ***We will continue to strategically and surgically price in a thoughtful way with focus on lifetime customer value. We believe service gaps have driven price sensitivity as fully satisfied customers typically don't leave because they've received a price increase. But the price increase can be a catalyst for cancellations or quits***.
>
> . . .
>
> Now let's shift to our strategic plan. We remain confident in our strategic plan, and we will continue to advance it. On Slide 7, this scorecard depicts our rating of how we are doing against several key initiatives. We talked a lot about sales today, and we are undoubtedly focused on accelerating revenue growth through addressing sales productivity. ***Customer retention is one of the single most important levers in our recurring revenue model and critical to our strategy to strengthen the base, capture share of wallet through cross-selling, to leverage idle capacity and fixed assets and enhance customer lifetime value.***
>
> ***We are hyper-focused on improving retention in support of our strategy as we already see the great progress we are making to cross-sell and gain penetration with our satisfied and loyal customers. Retention is moving back in the right direction. But even when at historical norms, we believe that it's still lower than our peers***. This presents a great opportunity for Vestis to create shareholder value as we enhance our service processes and ultimately increase retention and customer penetration. While we are working to enhance our service processes, we will be strategic about how and when we price so that we are building the company for the long term.

76. Later on the 2QFY24 Earnings Call, during the question-and-answer portion, the following exchange occurred in which Defendant Scott conveyed management’s conviction in Vestis’s operating plans and strategies:

> <Q: Stephanie Lynn Benjamin Moore – Jefferies LLC – Research Analyst> So maybe, Kim, given such a change in tone here in the last 90 days since you reported

1Q, I think including in the short period of time an erosion in national account business and now a reversal in pricing capabilities. How do we get comfortable that you have her arms around the operations and can meet this revised guidance for the year?

<A: Kimberly T. Scott> So Stephanie, we feel very confident in the strategy. We remain incredibly committed and we know that the value creation opportunity for Vestis this year. So ***this is about improving some service processes to make sure that our service experience with our customers is outstanding*** because improving revenue -- or excuse me, ***improving retention is the heartbeat of this model***. So our strategy is built on keeping loyal customers and then enhancing the lifetime value by cross-selling them. So we feel it's really imperative that we continue to enhance our processes and improve the retention experience. As we drive up that experience and it continues to improve and more customers continue to be loyal, it just fully supports our cross-sell initiatives and our desire to penetrate those customers and cross-sell other products and services. ***So we feel incredibly confident that we are on the right path and that making these corrections around service efficacy is just going to further strengthen our plan.***

As it relates to sales, there is without a doubt an opportunity to have a more high-performing sales team. We have great people who absolutely want to do a great job for the company and drive sales, but ***we need to support them with better enablement tools. We need to have more sophisticated processes around how we go to market. We are doing things like improving sales collateral, working on onboarding, recruiting the right profile of teammate who will thrive in this environment, but also training them and getting them the right tools and resources to sell effectively. So these are very known and understood opportunities, and we're incredibly mobilized around them.*** But I do want to reiterate, Stephanie, we believe in this plan. We believe in the value creation opportunity, and we have no doubt that there's going to be great value generated here over the long term.

<Q: Stephanie Lynn Benjamin Moore> Got it. And then just as a follow-up. I mean, clearly, it does sound like a lot of changes are being implemented, and you kind of noted just that we should start to see the benefits in fiscal 2025. So does that mean in your minds, we should be able to return to revenue growth in 2025, maybe in line with the targets you provided at your Analyst Day? And then how will pricing be part of that so -- since it looks like you're probably going to be a pretty decent comp on the pricing front as we look to 2025?

<A: Kimberly T. Scott> ***Yes. So as it relates to growth, we absolutely intend to return to positive growth in FY '25***. We'll talk more about what those growth rates will look like when we guide for the year. ***But we absolutely are accountable to and expect to return growth in FY '25. So you can count on that happening for sure, and we'll talk about those rates as we exit '24 and we guide for '25. So without a doubt***. And then as it relates to pricing, we believe very strongly that we could take more price right now if we wanted to. ***But we believe strongly that it is***

> ***important to improve service efficacy and to make sure that we are not taking price in the short term only to jeopardize customer retention rate in the long term***. So we will return to the ability to take more pricing, and we still feel strongly that inflationary environments, we can pass that price through as appropriate and that price will stick. So we will definitely continue to address pricing. We feel that we will improve our ability to take more price as we improve our service processes and our customer experience.
>
> And so we also will take price though, and we are taking price this year, and I want to be really clear about that. We have annual price increases and we have off-cycle price increases. We continue to take our normal annual price increases but our subjective discretionary off-cycle price increases are the price increases that we're moderating. We will also still be surgical and take price in certain areas as it relates to multiple stops in a week or a customer that is largely underpriced versus the average in the market. So there will still be pricing taking place. We're not shutting off pricing. We are just moderating pricing as it relates to the discretionary off-cycle pricing.

***August 7, 2024 Press Release and Earnings Call***

77. On August 7, 2024, the Company issued a press release concerning its financial results for the third quarter of the 2024 Fiscal Year (the "3QFY24 Press Release").

78. That same day, the Company hosted an earnings call to discuss the results stated above (the "3QFY24 Earnings Call"). During the 3QFY24 Earnings Call, Defendant Scott stated that the Defendants would "not discuss [the Company's] expectations or provide guidance for fiscal 2025 today."

79. At the same time, Defendant Dillon observed, in relevant part, that:

> [W]e saw improvement in our year-to-date retention rate over fiscal '23, and we expect this will drive lower carryover losses in '25. This is an important point that I want to emphasize: the prior year retention rate was a bigger headwind in 2024 than we expect it will be in 2025. Said differently, we begin fiscal 2025 in less of a hole from lost business than 2024.

***November 21, 2024 Press Release and Earnings Call***

80. On November 21, 2024, the Company issued a press release concerning its financial results for the fourth quarter of the 2024 Fiscal Year (the "4QFY24 Press Release"). The 4QFY24 Press Release also reported the Company's 2025 fiscal outlook stating, in relevant part:

> The Company expects fiscal 2025 revenue to be in the range of $2.8 billion to $2.83 billion and fiscal 2025 Adjusted EBITDA to be in the range of $345 million to $360 million.
>
> The Company's fiscal 2025 guidance is provided on a normalized 52-week fiscal year basis. Fiscal 2025 reported financials will include the impact of a 53rd week, with the extra week impacting the fourth quarter.
>
> The Company's strategic imperatives include disciplined capital allocation with deleveraging as a priority. The Company continues to expect strong free cash flow conversion and anticipate a ratio of free cash flow to Adjusted EBITDA of approximately 50%.

81. The 4QFY24 Press Release also quoted Defendant Scott, who stated the following regarding the Company's 2025 fiscal outlook:

> I am excited about the commercial momentum that is building across Vestis, the progress we are making executing against our efficient operations initiatives, and the way our organization has embraced our mission to deliver a best-in-class customer experience. As a result, we expect both revenue and Adjusted EBITDA to grow on an underlying basis in Fiscal 2025 as we continue to deliver against our strategic priorities.

82. Also on November 21, 2024, the Company hosted an earnings call to discuss its financial results for the fourth quarter of the 2024 Fiscal Year with investors, as well as the Company's 2025 fiscal outlook (the "4QFY24 Earnings Call"). During the 4QFY24 Earnings Call, Defendant Dillon explained in detail the Company's fiscal 2025 guidance to investors:

> [W]e expect ***revenue of $2.8 billion to $2.83 billion and adjusted EBITDA of $345 million to $360 million***. This results in a revenue growth from approximately 0% to 1% and an EBITDA margin of 12.3% to 12.7%. As Kim noted, our revenue guide reflects the absence of $13 million in onetime cost -- exit cost billings in fiscal '24 and $15 million associated with strategic exit of a large direct sale customer in 2024.
>
> ***As you think about the phasing of our guidance for the next year, it is important to note that both of these items***, along with fiscal '23 carryover pricing primarily impacted the front half of 2024 and the back half of fiscal '24 ***is more indicative of the starting point for our business heading into fiscal '25. As a result, we anticipate Q1 of fiscal '25 revenue and EBITDA will look similar to the fourth quarter of '24, with incremental improvement throughout the year*** as we continue to implement our strategic initiatives and cost structure enhancements.

> In closing, we're excited about the momentum of our business. ***We are confident in our ability to deliver against our 2025 commitments and our trajectory heading into 2026***.

83. Also during the 4QFY24 Earnings Call, Defendant Scott reinforced management's belief that the Company's fiscal 2025 guidance was attainable statin, in relevant part:

> I will also touch on some cost initiatives that give us great confidence in our ability to deliver against our commitments in fiscal 2025 and set us up for continued profitable growth as we move into fiscal 2026 and beyond.
>
> . . .
>
> In addition to new customer acquisition, we also continued to deliver strong results from route sales. Our route sales increased approximately 50% in fiscal 2024 and added more than 100 basis points of in-year revenue growth at high margin flow through. We have sustained this momentum into 2025, with route sales continuing to grow more than 50% on a year-to-date basis and in line with our objectives for 2025.
>
> . . .
>
> ***Now I want to discuss an area of our strategy where we are moving in the right direction, but still have opportunity to continue to improve the customer experience. We remain laser-focused on delivering a best-in-class customer experience that will support retaining and growing with our existing customers***. Importantly, our fiscal 2024 retention rate improved by 150 basis points year-over-year to 91.9%, which will position us better entering 2025 versus 2024. We are pleased with the year-over-year improvement in the fiscal 2024 rate.
>
> As we've mentioned in the past, there can be some seasonality in this metric, and we believe it is most useful to evaluate retention on a full year basis. That said, we are also pleased that our fourth quarter retention improved more than 400 basis points year-over-year and what has historically been our lowest quarter of the year from a seasonality perspective. As a reminder, our retention in the fourth quarter of fiscal 2023 included the impact of national account losses and customer response to significant fiscal 2023 pricing action.
>
> ***We are keenly focused on continued improvement in service measures, responding quickly to our customers' needs and always putting the customer first. We believe we can further improve our retention rate in fiscal 2025*** and we feel good about where the year has started with a retention rate of 93.7% in October.

***December 16, 2024 Proxy Statement***

84. On December 16, 2024, the Company filed the 2024 Proxy Statement with the SEC. The 2024 Proxy Statement was solicited by Defendants Scott, Holloman, Burke, Goetz, Jokinen, McKee, Meister, Pertz, Whitney, and Williams, pursuant to Section 14(a) of the Exchange Act, and contained materially false and misleading statements.

85. The 2024 Proxy Statement solicited shareholders to vote to, *inter alia*: (1) re-elect William W. Goetz, Lynn McKee, Keith A. Meister, and Doug Pertz as Class I directors for two-year terms; (2) vote to approve, on an advisory basis, named executive officer compensation; (3) vote to approve, on an advisory basis, the frequency of future advisory votes to approve named executive officer compensation ; and (4) vote to ratify the appointment of Deloitte & Touche LLP as the Company's independent registered public accounting firm.

86. With respect to the Code of Conduct and Code of Ethics, the 2024 Proxy Statement stated, in relevant part:

> We maintain a Code of Ethics for Senior Financial Officers that is applicable to our Chief Executive Officer, Chief Financial Officer, Principal Accounting Officer and other senior financial officers. The code requires our senior financial officers to engage in and promote honest and ethical conduct and produce full, fair, accurate, timely and understandable disclosure in reports and other documents we file with the Securities and Exchange Commission and in other public communications. Our senior financial officers may not, among other things, take any action to fraudulently influence, coerce, manipulate or mislead our independent public accountants for the purpose of rendering our financial statements materially misleading. The code promotes compliance with applicable laws, prompt internal reporting of violations and accountability for adherence to the code.
>
> We also maintain a Business Conduct Policy that applies to all our employees and sets forth our policies and expectations on a number of topics, including conflicts of interest, confidentiality, compliance with laws (including insider trading laws), preservation and use of our assets, and business ethics. The Business Conduct Policy sets forth procedures for addressing potential conflicts of interest (or the appearance of a conflict of interest) and for the confidential communication and handling of issues regarding accounting, internal control and auditing matters.

87. In a section titled "Board of Directors' Role in Risk Oversight," the 2024 Proxy Statement stated the following:

> Our management is responsible for day-to-day risk management activities. Our Board, acting directly and through its committees, is responsible for the oversight of our risk management.
>
> The Audit Committee periodically reviews our accounting, reporting and financial practices, including the integrity of our financial statements, the surveillance of administrative and financial controls and our compliance with legal and regulatory requirements. In addition, the Audit Committee reviews risks related to compliance with ethical standards, including our Business Conduct Policy (discussed below), and our approach to enterprise risk management and operational risks, including those related to information security and system disruption. With respect to cybersecurity, the Audit Committee monitors our cybersecurity risk profile, receives periodic updates from management on all matters related to cybersecurity and reports to our full Board. Through regular meetings with management, including the accounting, finance, legal, information technology and internal audit functions, the Audit Committee reviews and discusses the risks related to its areas of oversight and reports to our Board with regard to its review. The Compensation Committee oversees compensation-related risk management. The Nominating Committee oversees risks associated with the structure of our Board and other corporate governance policies and practices. The Compensation and Nominating Committees also regularly report their findings to our Board.
>
> Our Chief Executive Officer and other executive officers regularly report to the non-executive directors and the Audit, Compensation and Nominating Committees to ensure effective and efficient oversight of our activities and to assist in proper risk management and the ongoing evaluation of management controls. In addition, our Board receives periodic detailed operating performance reviews from management. Our Vice President of Internal Audit reports functionally and administratively to our Chief Financial Officer and directly to the Audit Committee. We believe that the leadership structure of our Board provides appropriate risk oversight of our activities.

88. The 2024 Proxy Statement was materially misleading because it failed to disclose, *inter alia*, that contrary to the 2024 Proxy Statement's descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements to the investing public.

89. The 2024 Proxy Statement also failed to disclose, *inter alia*, that: (1) the risks associated with seasonality and macroeconomic shifts were substantially greater than represented; (2) the Company's anticipated growth and projected revenue were overstated; and (3) as a result

the Company's guidance for the 2025 Fiscal Year was substantially overstated. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

90. As a result of the material misstatements and omissions contained in the 2024 Proxy Statement, Company shareholders: reelected Defendants Goetz, McKee, Meister, and Pertz to the Board, thereby allowing them to continue to breach their fiduciary duties to Vestis; (2) approved, on an advisory basis, named executive officer compensation; (3) approved, on an advisory basis, the frequency of future advisory votes to approve named executive officer compensation; and (4) ratified the appointment of Deloitte & Touche LLP as the Company's independent registered public accounting firm.

***January 31, 2025 Press Release and Earnings Call***

91. On January 31, 2025, the Company issued a press release regarding its financial results for the first quarter of the 2025 Fiscal Year (the "1QFY25 Press Release"). The 1QFY25 Press Release also issued specific guidance for the Company in the second quarter of the 2025 Fiscal Year.

92. That same day, the Company hosted an earnings call to discuss the same matters presented in the 1QFY25 Press Release (the "1QFY25 Earnings Call"). During the call, Defendant Scott reported the following, in relevant part:

> Our Q1 results came in as we expected. Last quarter, we communicated Q1 revenue and EBITDA would look similar to the fourth quarter of FY '24. We delivered results in line with this commentary with Q1 revenue of $684 million, ***flat sequentially*** from fourth quarter 2024 and adjusted EBITDA of $81.2 million, ***up approximately 1% sequentially*** from fourth quarter 2024.
>
> We also note our Q1 revenue was impacted by unfavorable movement in the Canadian dollar exchange rate, which had a negative impact relative to last year and the assumption in our guidance. Compared to the first quarter of fiscal 2024, revenue was down 4.7% or 4.5% on a constant currency basis. As we previously

discussed, our 2025 results exclude the benefit of onetime customer exit billings and revenue from the large direct sales customer that we exited in FY '24 as part of our profit improvement plan for this line of business.

Adjusted for these items, which we believe represents a more accurate reflection of the underlying performance of our business, ***first quarter revenue declined 2.8% on a normalized constant currency basis and what we expect will be both the toughest comp and the low point for our quarterly revenue in fiscal 2025.***

. . .

I'm excited by all aspects of our business, but especially by a particular milestone we expect to hit in Q2. ***Toward the end of the second quarter, we expect new volume growth will exceed lost business driven by field sales productivity, national account wins, new frontline sales headcount growth and solid retention metrics.***

Further, ***we started taking price in Q1, which held well and will continue through the year.*** In addition to core volume growth and price, we have cost savings benefits throughout the year. And to that end, we are reaffirming our full year FY '25 guidance for revenue and EBITDA.

We expect our business will grow sales at a rate of 3% to 4% with EBITDA growth approaching or exceeding 10% in the second half of the year.

For FY '25 revenues, there are 4 main drivers that will support our sequential ramp. The first driver is strong new volume wins across SME field sales and national accounts.

. . .

The second driver in our sequential acceleration is growth with existing customers. During Q1, our revenue from route sales to existing customers increased by more than 50% year-over-year.

The third driver is our hiring pipeline for frontline sales teammates. After intentionally slowing our frontline sales hiring in 2024, we have once again resumed hiring in 2025.

. . .

The fifth (sic) [fourth] driver is our retention metric. In the first quarter, our customer retention rate was 92.9%, up 30 basis points year-over-year and up 280 basis points versus the fourth quarter. As we've mentioned in the past, we feel it is most useful to evaluate retention on a full year basis, which we believe is most indicative of our underlying performance. Going forward, we will continue to

> report customer retention on an annual basis with quarterly disclosure focused on the in-period revenue impact from lost business.
>
> To recap, I believe in our sequential revenue guidance because of the new customers we're winning across SMEs and national accounts. Our ramp in sales force hiring, our growth with existing customers and our Q1 retention metrics.
>
> For FY '25 EBITDA, in addition to the net volume improvement, there are 3 main drivers that support our sequential ramp. The first driver is meaningful cost savings from operating more efficiently.
>
> . . .
>
> The second driver is optimizing our workforce to further drive cost performance and structural profitability of our business
>
> . . .
>
> The final driver of our EBITDA ramp is our in-select in-year pricing. We have improved our market segmentation, and we observed pricing in Q1 stuck better than in other quarters. We expect to continue to realize net positive price increases with our existing customer base in FY '25.

93. These statement referenced and identified in ¶¶ 72-81 and ¶¶ 89-90 were false and misleading because they failed to disclose, *inter alia*, that (1) the risks associated with seasonality and macroeconomic shifts were substantially greater than represented; (2) the Company's anticipated growth and projected revenue were overstated; and (3) as a result the Company's guidance for the 2025 Fiscal Year was substantially overstated. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

## **The Truth Emerges**

***May 7, 2025 Press Release and Earnings Call***

94. On May 6, 2025, the truth fully emerged when Vestis issued a press concerning its financial results for the second quarter of the 2025 Fiscal Year (the "2QFY25 Press Release"). The

2QFY25 Press Release reported financial results below the Company's expectations, and notably withdrew the Company's full-year guidance for the 2025 Fiscal Year.

95. The following day, on May 7, 2025, during the 2QFY25 Earnings Call, Defendant Holloman discussed the Company's financial results stated above as well as the appointment of the Company's new CEO. Defendant Holloman stated, in relevant part:

> ***Jim Barber, former Chief Operating Officer of UPS, will be stepping into the role of President and Chief Executive Officer, effective June 2, 2025***. At that time, I will return to my role as Chairman of the Board. Jim is a proven leader with a track record of driving profitable growth, and I look forward to working closely with him to ensure a seamless transition.
>
> I will begin my remarks with an overview of the second quarter performance, specifically what changed between Q1 and Q2 and why we did not deliver the revenue growth that we expected this quarter
>
> . . .
>
> ***Second quarter revenue was $665 million, which declined approximately $18 million from Q1 or 2.7%, a significant difference from the growth we implied in our guidance.*** Excluding a $15 million onetime bad debt adjustment that Kelly will discuss, adjusted EBITDA was $63 million or 9.4% of revenue, a 250-basis point reduction compared to Q1. This decrease in margin from our lower revenue demonstrates the operating leverage inherent in our relatively fixed cost structure, which in times of revenue growth is beneficial.
>
> ***During the quarter, $7 million of decline was related to direct sales and $11 million of the decline was from our rental business, which we had expected to grow given the previous trends. While this was partially driven by lost business and excess of new business, the main reason for the decrease was lower adds over stops, which is how we describe volume changes with our existing customers.***
>
> ***In January, we saw a significant decline in volume as some customers seasonally adjusted their demand for our products, specifically workplace supplies***. For example, many of our hospitality customers have lower demand in the weeks following the holiday season. Additionally, within our rental business, we periodically bill customers for inventory that they have either lost or ruined, which we call L&Rs. This revenue can fluctuate from quarter-to-quarter. And during quarter 2, we had approximately $4 million less L&R compared to Q1.
>
> And while these are not the results we expected to deliver, I want to convey a few things. First, over the course of the second quarter, we have recovered the majority of the January decline in rental revenue. Second, we have taken meaningful actions to further improve revenue, including focusing on decreasing the number of credits

> being issued to our customers. We have done this by improving specific customer service issues, such as product shortages and cleaning quality and have seen a positive impact from these actions on our revenue run rate in a relatively short time frame. Together, these improvements supported our April average weekly revenue returning back to December levels. And finally, we continue to take steps to improve our forecasting capability.
>
> ***Let me be clear, we are disappointed with our second quarter performance*** …

96. The current CFO, Kelly Janzen, also discussed the Company's lackluster financial results for the second quarter of the 2025 Fiscal Year as well as the Company's recission of its fiscal 2025 guidance. In relevant part, CFO Janzen stated:

> On a rolling 12-month basis, our customer retention was 92.4% at the end of Q2, which is relatively consistent with the annual rates we have seen in previous years. We remain highly focused on both generating new business and effectively managing our lost business.
>
> ***Revenue from existing customers declined approximately $8 million in the second quarter compared to Q1, which includes the $4 million in L&R revenue that Phillip discussed.*** We continue to realize price increases with our existing customers. And while new pricing has been partially offset by price adjustments elsewhere, our overall net pricing was positive by $3.5 million as compared to the first quarter.
>
> Net volume from existing customers, which we call adds over stops, declined $6.5 million in Q2 relative to the first quarter. ***We saw a significant decline in volume as some customers seasonally adjusted demand for our products, specifically workplace supplies***. Additionally, our revenue was negatively impacted by volume-related credits issued to customers to address service concerns. Over the course of the last 2 months, we have further increased our efforts to mitigate these issues and as a result, have seen a significant reduction in weekly customer credits.
>
> . . .
>
> Second quarter reported adjusted EBITDA was $48 million and excluding the $15 million onetime bad debt adjustment was $63 million, representing a margin of 9.4%. This compares to 11.9% in the first quarter of 2025 and 12.4% in Q2 of 2024.
>
> . . .
>
> Now turning to guidance. ***Given the recent events as well as the increasingly uncertain macro environment, we are shifting to quarterly guidance rather than providing a full year outlook***. Our recent weekly revenue trends suggest that our third quarter revenue will be in the range of $674 million to $682 million, and we

> expect adjusted EBITDA to be at least $63 million, indicating sequential improvement as we continue to invest in the resources we need to drive sustainable and profitable growth. We will continue to focus on improving free cash flow conversion over the long term, but we will no longer be providing guidance for free cash flow.
>
> ***We are disappointed with our first half results***.

97. On this news, in the after-market hours of May 6, 2025, the Company's stock price fell $3.27 per share, or roughly 37.5%, from a closing price of $8.71 per share on May 6, 2025 to close at $5.44 per share on May 7, 2025.

**DAMAGES TO VESTIS**

98. As a direct and proximate result of the Individual Defendants' conduct, Vestis will lose and expend many millions of dollars.

99. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

100. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on any misconduct alleged herein and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

101. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

102. As a direct and proximate result of the Individual Defendants' conduct, Vestis has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount"

that will plague the Company's stock in the future due to the Company's and their misrepresentations.

**DERIVATIVE ALLEGATIONS**

103. Plaintiff brings this action derivatively and for the benefit of Vestis to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Vestis, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of Sections 14(a), 10(b) and 21D of the Exchange Act and the aiding and abetting thereof.

104. Vestis is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

105. Plaintiff is, and has been at all relevant times, a shareholder of Vestis. Plaintiff will adequately and fairly represent the interests of Vestis in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

**DEMAND FUTILITY ALLEGATIONS**

106. Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

107. A pre-suit demand on the Board of Vestis is futile and, therefore, excused. At the time of filing of this complaint, the Board consists of the following ten individuals: Defendants Holloman, Burke, Goetz, Jokinen, McKee, Meister, Pertz, Whitney, Williams (the "Director Defendants"), and non-party Jim Barber ("Barber") (together with the Director Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to five of the ten Directors that were on the Board at the time of the filing of this complaint.

108. Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to cause the Company to make false and misleading statements and omissions of material fact, which renders the Director Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the schemes.

109. In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly participated in causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. Moreover, the Director Defendants caused the Company to fail to maintain adequate internal controls. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

110. Additional reasons that demand on Defendant Holloman is futile follow. Defendant Holloman has served as a Company director and as the Chairman of the Board since the Spinoff. Defendant Holloman currently serves as a member of the Nominating, Governance, and Corporate Responsibility Committee. Additionally, Defendant Holloman served as the interim Executive Chairman, President and CEO from March 18, 2025 to June 2, 2025 (during this period, Defendant Holloman temporarily stepped down from his position on the Nominating, Governance, and Corporate Responsibility Committee). Thus, Defendant Holloman is not an independent director. Defendant Holloman has received and continues to receive compensation for his role as a director as described above. As a trusted Company director and as the Chairman of the Board, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading

statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Moreover, Defendant Holloman solicited the false and misleading 2024 Proxy Statement, which led to shareholders voting, *inter alia*, to reelect Defendants Goetz, McKee, Meister, and Pertz to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Holloman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

111. Additional reasons that demand on Defendant Burke is futile follow. Defendant Burke has served as a Company director since the Spinoff. Defendant Burke also serves as the Chair of the Board's Nominating, Governance, and Corporate Responsibility Committee and as a member of the Compensation and Human Resources Committee. Defendant Burke has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Moreover, Defendant Burke solicited the false and misleading 2024 Proxy Statement, which led to shareholders voting, *inter alia*, to reelect Defendants Goetz, McKee, Meister, and Pertz to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Burke breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

112. Additional reasons that demand on Defendant Goetz is futile follow. Defendant Goetz has served as a Company director since August 3, 2024. Defendant Goetz also serves as the member of the Nominating, Governance, and Corporate Responsibility Committee. Defendant Goetz has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Moreover, Defendant Goetz solicited the false and misleading 2024 Proxy Statement, which led to shareholders voting, *inter alia*, to reelect Defendants McKee, Meister, Pertz, and himself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Goetz breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

113. Additional reasons that demand on Defendant Jokinen is futile follow. Defendant Jokinen has served as a Company director since the Spinoff. Defendant Jokinen also serves as the Chair of the Board's Audit Committee and as a member of the Compensation and Human Resources Committee. Defendant Jokinen has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. Moreover, Defendant Jokinen solicited the false and misleading 2024 Proxy Statement, which led to shareholders voting, *inter alia*, to reelect Defendants Goetz, McKee, Meister, and Pertz to the Board, thereby allowing

them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Jokinen breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

114. Additional reasons that demand on Defendant McKee is futile follow. Defendant McKee has served as a Company director since the Spinoff. Previously, Defendant McKee served as executive vice president and chief human resources officer for Aramark from 2004 until 2022. Thus, as the Company admits, Defendant McKee is not independent. Defendant McKee has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. Moreover, Defendant McKee solicited the false and misleading 2024 Proxy Statement, which led to shareholders voting, *inter alia*, to reelect Defendants Goetz, Meister, Pertz, and herself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant McKee breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

115. Additional reasons that demand on Defendant Meister is futile follow. Defendant Meister has served as a Company director since June 18, 2024. Defendant Meister currently serves as a member of the Audit Committee. Defendant Meister has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting

and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Moreover, Defendant Meister solicited the false and misleading 2024 Proxy Statement, which led to shareholders voting, *inter alia*, to reelect Defendants Goetz, McKee, Pertz, and himself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Meister breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

116. Additional reasons that demand on Defendant Pertz is futile follow. Defendant Pertz has served as a Company director since the Spinoff. Defendant Pertz also serves as the Chair of the Board's Compensation and Human Resources Committee and as a member of the Audit Committee. Defendant Pertz has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Moreover, Defendant Pertz solicited the false and misleading 2024 Proxy Statement, which led to shareholders voting, *inter alia*, to reelect Defendants Goetz, McKee, Meister, and himself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Pertz breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

117. Additional reasons that demand on Defendant Whitney is futile follow. Defendant Whitney has served as a Company director since the Spinoff. Defendant Whitney also serves as a member of the Audit Committee. Defendant Whitney has received and continues to receive

compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. Moreover, Defendant Whitney solicited the false and misleading 2024 Proxy Statement, which led to shareholders voting, *inter alia*, to reelect Defendants Goetz, McKee, Meister, and Pertz to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Whitney breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

118. Additional reasons that demand on Defendant Williams is futile follow. Defendant Williams has served as a Company director since the Spinoff. Defendant Williams also serves as a member of the Compensation and Human Resources Committee and the Nominating, Governance, and Corporate Responsibility Committee. Defendant Williams has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. Moreover, Defendant Williams solicited the false and misleading 2024 Proxy Statement, which led to shareholders voting, *inter alia*, to reelect Defendants Goetz, McKee, Meister, and Pertz to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Williams breached her fiduciary duties, faces a

substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

119. Additional reasons that demand on non-party Barber is futile follow. Barber is neither disinterested nor independent, and therefore, is incapable of considering demand because he, as the Company's CEO, is an employee of the Company, and thus derives substantially all of his income from his employment with Vestis, thereby rendering him not independent. As such, Barber could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Barber is therefore futile.

120. Additional reasons that demand on the Board is futile follow.

121. Defendants Jokinen (as chair), Meister, Pertz, and Whitney, served as members of the Audit Committee during the Relevant Period. In violation of the Audit Committee Charter, Defendants Jokinen, Meister, Pertz, and Whitney failed to adequately review and discuss the Company's press releases; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct and Code of Ethics. Thus, Defendants Jokinen, Meister, Pertz, and Whitney further breached their fiduciary duties, are not disinterested, and demand is excused as to them.

122. In violation of the Code of Conduct and Code of Ethics, the Director Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Sections 14(a), 10(b) and 21D of the Exchange Act. In violation of the Code of Conduct and Code of Ethics, the Director Defendants failed to avoid

conflicts of interest or the appearance of conflicts of interest; maintain the accuracy of Company records; protect and ensure the efficient use of Company assets; comply with all applicable laws, rules, and regulations, and properly report violations of the Code of Conduct and Code of Ethics and applicable laws, rules, and regulations. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

123. Vestis has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Vestis any part of the damages Vestis suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

124. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

125. The acts complained of herein constitute violations of fiduciary duties owed by Vestis's officers and directors, and these acts are incapable of ratification.

126. The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate

funds, i.e., monies belonging to the stockholders of Vestis. If there is a directors' and officers' liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of Vestis, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

127. If there is no directors' and officers' liability insurance, then the Director Defendants will not cause Vestis to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

128. Thus, for all of the reasons set forth above, all of the Director Defendants, and, if not all of them, at least five of the Director Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
**Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act**

129. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

130. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of

such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

131. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

132. Under the direction and watch of Defendants Scott, Burke, Goetz, Holloman, Jokinen, McKee, Meister, Pertz, Whitney, and Williams, the 2024 Proxy Statement failed to disclose, *inter alia*, that: (1) the risks associated with seasonality and macroeconomic shifts were substantially greater than represented; (2) the Company's anticipated growth and projected revenue were overstated; and (3) as a result the Company's guidance for the 2025 Fiscal Year was substantially overstated. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

133. The 2024 Proxy Statement also failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct and Code of Ethics, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

134. In the exercise of reasonable care, Defendants Scott, Holloman, Burke, Goetz, Jokinen, McKee, Meister, Pertz, Whitney, and Williams should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on matters set forth for shareholder determination in the 2024 Proxy Statement including, but not limited to the election of directors.

135. As a result of Defendants Scott, Holloman, Burke, Goetz, Jokinen, McKee, Meister, Pertz, Whitney, and Williams causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted to, *inter alia*, to: (1) reelect Defendants Goetz, McKee, Meister, and Pertz to the Board, thereby allowing them to continue to breach their fiduciary duties to Vestis; (2) approve, on an advisory basis, named executive officer compensation; (3) approve, on an advisory basis, the frequency of future advisory votes to approve named executive officer compensation; and (4) ratify the appointment of Deloitte & Touche LLP as the Company's independent registered public accounting firm.

136. The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2024 Proxy Statement.

137. Plaintiff, on behalf of Vestis, has no adequate remedy at law.

## <u>SECOND CLAIM</u>

### Against the Individual Defendants for Breach of Fiduciary Duties

138. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

139. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Vestis's business and affairs.

140. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

141. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Vestis.

142. In breach of their fiduciary duties owed to Vestis, the Individual Defendants willfully or recklessly caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the risks associated with seasonality and macroeconomic shifts were substantially greater than represented; (2) the Company's anticipated growth and projected revenue were overstated; and (3) as a result the Company's guidance for the 2025 Fiscal Year was substantially overstated. In light of the above, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

143. The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

144. The Individual Defendants had actual or constructive knowledge that they had caused the Company to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Vestis's

securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

145. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

146. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Vestis has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

147. Plaintiff, on behalf of Vestis, has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

148. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

149. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Vestis.

150. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Vestis that was tied to the performance or artificially inflated valuation of Vestis or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

151. Plaintiff, as a shareholder and a representative of Vestis, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

152. Plaintiff, on behalf of Vestis, has no adequate remedy at law.

**FOURTH CLAIM**

**Against Individual Defendants for Abuse of Control**

153. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

154. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Vestis, for which they are legally responsible.

155. As a direct and proximate result of the Individual Defendants' abuse of control, Vestis has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Vestis has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

156. Plaintiff, on behalf of Vestis, has no adequate remedy at law.

**FIFTH CLAIM**

**Against Individual Defendants for Gross Mismanagement**

157. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

158. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Vestis in a manner consistent with the operations of a publicly held corporation.

159. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Vestis has sustained and will continue to sustain significant damages.

160. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

161. Plaintiff, on behalf of Vestis, has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

162. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

163. The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

164. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Vestis to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

165. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

166. Plaintiff, on behalf of Vestis, has no adequate remedy at law.

## SEVENTH CLAIM

### Against Defendants Scott and Dillon for Contribution Under Sections 10(b) and 21D of the Exchange Act

167. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

168. Vestis and Defendants Scott and Dillon are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b)

and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Scott's and Dillon's willful and/or reckless violations of their obligations as officers and/or directors of Vestis.

169. Defendants Scott and Dillon, because of their positions of control and authority as officers and/or directors of Vestis, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Vestis, including the wrongful acts complained of herein and in the Securities Class Action.

170. Accordingly, Defendants Scott and Dillon are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

171. As such, Vestis is entitled to receive all appropriate contribution or indemnification from Defendants Scott and Dillon.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Vestis, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Vestis;

(c) Determining and awarding to Vestis the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing Vestis and the Individual Defendants to take all necessary actions to reform and improve Vestis's corporate governance and internal procedures to comply with applicable laws and to protect Vestis and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Vestis to nominate at least five candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e) Awarding Vestis restitution from the Individual Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: July 29, 2025

Respectfully Submitted,

**THE BROWN LAW FIRM, P.C.**

*/s/ Timothy Brown*

Timothy Brown
Saadia Hashmi
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Email: tbrown@thebrownlawfirm.net

# VERIFICATION

I, Michael Gribe, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 19 day of June, 2025.

DocuSigned by:

5FB460828B5D439...

Michael Gribe