**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MICHAEL GRIBE, derivatively on behalf of VESTIS CORPORATION,<br><br>Plaintiff,<br><br>vs.<br><br>KIMBERLY SCOTT, PHILLIP HOLLOMAN, RICHARD BURKE, WILLIAM W. GOETZ, TRACY JOKINEN, LYNN MCKEE, KEITH A. MEISTER, DOUG PERTZ, MARY ANNE WHITNEY, and ENA WILLIAMS,<br><br>Defendants,<br><br>and<br><br>VESTIS CORPORATION,<br><br>Nominal Defendant. | Case No. 1:25-cv-06234-GHW<br><br>**DEMAND FOR JURY TRIAL** |

## VERIFIED SHAREHOLDER DERIVATIVE AMENDED COMPLAINT

## INTRODUCTION

Plaintiff Michael Gribe ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Vestis Corporation ("Vestis" or the "Company"), files this Verified Shareholder Derivative Amended Complaint against Kimberly Scott ("Scott"), Phillip Holloman ("Holloman"), Richard Burke ("Burke"), William W. Goetz ("Goetz"), Tracy Jokinen ("Jokinen"), Lynn McKee ("McKee"), Keith A. Meister ("Meister"), Doug Pertz ("Pertz"), Mary Anne Whitney ("Whitney"), and Ena Williams ("Williams") (collectively, the "Individual Defendants," and together with Vestis, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Vestis, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Section 14(a) of the Securities Exchange Act of 1934 (the

"Exchange Act"), and for contribution against Defendant Scott under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's amended complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Vestis, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.[1]

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by Vestis's directors and officers from May 2, 2024 to May 6, 2025, both dates inclusive (the "Relevant Period").

2. Vestis is a major distributor of workplace supplies, notably uniform rentals, throughout the United States and Canada. Vestis is the product of a September 2023 separation by Aramark, a global provider of food and facilities services, of its Aramark Uniform Services ("AUS") segment into an independent public company (the "Spinoff").

3. Before the Spinoff occurred, AUS was Aramark's smallest division and had been underfunded and underperforming for years. Aramark decided to separate AUS due to the significant debt that Aramark had incurred during the COVID-19 pandemic. By 2021, Aramark's

[1] Unless otherwise specified, all internal quotation marks herein are omitted and all emphasis is supplied. Additionally, capitalization in quoted material may be altered.

debt had reached approximately $7.4 billion. To make the Spinoff successful, Aramark and Vestis had to convince investors that AUS could perform independently. Aramark hired Defendant Scott, as Chief Executive Officer ("CEO") for AUS to take Vestis through the Spinoff, and to serve as CEO for Vestis afterwards. Both before and after the Spinoff, Defendant Scott and the other Individual Defendants overstated the changes they had made to AUS and Vestis's operations that would allow it to perform substantially better as an independent company.

4. On May 2, 2024, the Individual Defendants disclosed how the Company had been performing up to that point. In a press release, Vestis revealed weak revenue performance, and in a 2024 earnings call, Defendant Scott disclosed various operational and logistical issues Vestis had been facing, which caused Vestis to lose customers. To avoid continued harm, the Individual Defendants began representing to investors that the issues plaguing Vestis were behind the Company, and that these issues had been properly addressed. In reality, however, the Individual Defendants were aware of the Company's continued operational failures and knew that the Company had not taken sufficient steps to rectify these issues.

5. In the May 2, 2024 press release reporting on the Company's financial results for the second quarter of the 2024 Fiscal Year (the "2QFY24 Press Release"), Defendant Scott was quoted as stating that "***operating trends are improving across our business***."

6. During an earnings call on November 21, 2024, in response to an analyst's question about how Vestis was fixing its operations, Defendant Scott responded by claiming that "we're seeing the level of performance rise across the system with particular focus on those locations that are underperforming versus the norm. Our goal is to raise the entire bar for the whole organization. We're seeing that happen on-time delivery already."

7. By making these statements, the Individual Defendants made false and misleading representations and/or failed to disclose material adverse facts about Vestis's business, operations, and prospects. In particular, the Individual Defendants failed to disclose to shareholders and investors that: (1) the operational deficiencies and product shortages the Company was experiencing prior to the start of the Relevant Period were not improving; (2) these issues caused the Company to delay new customer installations and prevented the Company from properly servicing its existing customers; and (3) the resulting customer dissatisfaction resulted in customers seeking credits, lowering invoice minimums, and pursuing cancellations, deviations, and buyouts. In light of the above, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

8. Without correcting these statements or disclosing the truth, the Company filed a December 16, 2024 Proxy Statement soliciting shareholders, among other things, to: (1) re-elect Defendants Goetz, McKee, Meister, and Pertz as Class I directors for two-year terms; (2) vote to approve, on an advisory basis, named executive officer compensation; (3) vote to approve, on an advisory basis, the frequency of future advisory votes to approve named executive officer compensation ; and (4) vote to ratify the appointment of Deloitte & Touche LLP as the Company's independent registered public accounting firm.

9. The truth began to emerge on May 6, 2025, when the Company reported disappointing financial results for the second quarter of the 2025 Fiscal Year, namely that the Company experienced a revenue decline "primarily" due to "lost business in excess of new business," in addition to a $15 million "bad debt" expense. The next day, on May 7, 2025, the Company hosted an earnings call regarding its financial results for the second quarter of the 2025

Fiscal Year (the "2QFY25 Earnings Call"). Defendant Holloman explained on the 2QFY25 Earnings Call that some of the reasons for the Company's unsatisfactory financial results included "lower adds over stops, which is how [the Company] describe[s] volume changes with our existing customers[,]" and to a lesser extent "lost business in excess of new business[.]"

10. Defendant Holloman also highlighted how the Company needed to improve its customer service, despite Defendant Scott's previous statements about how the Company's customer experience and customer service had already improved, with Defendant Holloman noting that "***[w]e can and we will do better through serving our customers***."

11. On this news, the Company's stock price fell $3.27 per share, or roughly 37.5%, from a closing price of $8.71 per share on May 6, 2025 to close at $5.44 per share on May 7, 2025.

12. In light of the Individual Defendants' misconduct—which has subjected the Company and various of its current and former officers and directors to a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of New York, captioned *Board of Trustees of the Police Officers' Retirement Plan & Trust Fund for the City of Miramar v. Vestis Corporation, et al.*, Case No. 1:25-cv-04844-GHW ("Securities Class Action"), which survived, in part, a motion to dismiss on July 31, 2025 (the "MTD Order"), and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars. The Company has been substantially damaged as a result of the Individual Defendants' knowing breaches of fiduciary duty and/or conscious disregard for same and other misconduct.

13. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of the officers' and directors' liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence. Plaintiff thus brings this action to recover on behalf of the Company.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

15. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

16. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

17. Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

**Plaintiff**

18. Plaintiff first acquired Aramark common stock in 2021, received Vestis shares in connection with Aramark's September 30, 2023 distribution of Vestis shares to its stockholders, and continues to hold his Vestis stock today. Plaintiff thus has continuously held shares of Vestis common stock at all relevant times.

**Nominal Defendant Vestis**

19. Vestis is a Delaware corporation with principal executive offices at 1035 Alpharetta Street, Suite 2100, Roswell, Georgia. Vestis common stock trades on the NYSE under the ticker symbol "VSTS."

**Defendant Scott**

20. Defendant Scott served as Vestis's President and CEO and as a Company director from the Spinoff until March 18, 2025. Previously, she served as President and CEO of Aramark's AUS segment from October 2021 until the Spinoff.

21. The proxy statement filed with the SEC on December 16, 2024 (the "2024 Proxy Statement") stated the following about Defendant Scott:

> Ms. Scott serves as the President and Chief Executive Officer of Vestis. She joined Aramark in October 2021 to serve as President and Chief Executive Officer of Aramark Uniform Services and to prepare Vestis to be a standalone, independent public company. Previously, Ms. Scott served as Chief Operating Officer of Terminix Global Holdings, Inc. (NYSE: TMX) from January 2021 to September 2021, overseeing operations for both the residential and commercial businesses, after having served as President of Terminix Residential from December 2019 to January 2021. Prior to Terminix, she served as President of Rubicon Global from July 2018 to September 2019, a role that followed an 11-year career at Brambles Limited, which culminated in Ms. Scott serving as President, CHEP North America for four years. Early in her career, Ms. Scott gained industrial manufacturing experience at the General Electric Company (NYSE: GE) and U.S. Steel (NYSE: X). She serves as a member of the board of directors for Greif, Inc. (NYSE: GEF).

**Defendant Holloman**

22. Defendant Holloman has served as a Company director and as the Chairman of the Board since the Spinoff. Defendant Holloman also served as interim Executive Chairman, President and CEO from March 18, 2025 to June 1, 2025. Defendant Holloman also serves as a member of the Board's Nominating, Governance, and Corporate Responsibility Committee, but stepped down from his committee position for the period in which he served as interim Executive Chairman, President, and CEO.

23. The proxy statement filed with the SEC on January 8, 2026 (the "2026 Proxy Statement") stated the following about Defendant Holloman:

> Background:
>
> Mr. Holloman has served as the Chairman of the Board of Directors since September 2023. He also served as the interim Executive Chairman, President and Chief Executive Officer of Vestis from March 18, 2025 to June 1, 2025. Mr. Holloman retired from Cintas as president and chief operating officer in 2018. Other roles during his 22-year career with Cintas included rental division president and chief operating officer, senior vice president of global supply chain management, executive champion of Six Sigma Initiatives, vice president of distribution/production planning and vice president of engineering and construction. Mr. Holloman is a founding member of Cintas' diversity committee and received the Excalibur Award, the company's highest distinction reserved for business executives who demonstrate excellence during their tenure. He serves as a member of the board of directors for the BlackRock Fixed Income Board and was previously a member of the board of directors for Pulte Group (NYSE: PHM) and Rockwell Automation (NYSE: ROK). In addition, Mr. Holloman serves on the board of trustees for the University of Cincinnati.
>
> Qualifications:
>
> Mr. Holloman is well qualified to serve on our Board because of his extensive industry and senior management experience and deep knowledge of corporate strategy and operations.

**<u>Defendant Burke</u>**

24. Defendant Burke has served as a Company director since the Spinoff. Defendant Burke also serves as the Chair of the Board's Nominating, Governance, and Corporate

Responsibility Committee and as a member of the Compensation and Human Resources Committee.

25. The 2026 Proxy Statement stated the following about Defendant Burke:

Background:

Mr. Burke previously served as chairman of the board and chief executive officer of Advanced Disposal Services, Inc. (NYSE: ADSW), an integrated environmental services company, from 2012 to 2020. Prior to that role, he served as president and chief executive officer of Veolia Environmental Services North America Corp., a solid waste and hazardous waste management company, from 2009 to 2012, and as president of Veolia ES Solid Waste, from 2007 to 2009. Mr. Burke currently serves on the board of U.S. Infrastructure Company, an underground utility locating business owned by Partners Group, and Biffa, a U.K. waste and recycling business owned by Energy Capital Partners.

Qualifications:

Mr. Burke is well qualified to serve on our Board because of his extensive industry and senior management experience and deep knowledge of corporate strategy, operations and finance.

**Defendant Goetz**

26. Defendant Goetz has served as a Company director since August 3, 2024. Defendant Goetz currently serves as a member of the Nominating, Governance, and Corporate Responsibility Committee.

27. The 2026 Proxy Statement stated the following about Defendant Goetz:

Background:

Mr. Goetz served as President and Chief Executive Officer for DYMA Brands, a leading manufacturer to the foodservice industry, from 2020-2024. Prior to that, he served as President and COO of Carriage Services, held roles of increasing responsibility at Sysco Corporation, including Senior Vice President of Sales and Marketing and Chief Marketing Officer. Additionally, he spent 22 years at Cintas Corporation in various executive leadership roles, including President and COO of Global Accounts and Strategic Markets and Chief Marketing Officer. Mr. Goetz currently serves on the board of directors for Depot Connect International and is a National Trustee of the Boys & Girls Club of America.

Qualifications:

> Mr. Goetz is well qualified to serve on our Board because of his extensive senior leadership experience, and deep knowledge in industrial laundry sales, marketing, and product development.

**Defendant Jokinen**

28. Defendant Jokinen has served as a Company director since the Spinoff. Defendant Jokinen also serves as the Chair of the Board's Audit Committee.

29. The 2026 Proxy Statement stated the following about Defendant Jokinen:

> Background:
>
> Ms. Jokinen has over 30 years of finance and accounting experience across various global industries, where she focused on accelerating profitable growth and business transformation in her role as chief financial officer for both public and private companies. Most recently, Ms. Jokinen was executive vice president and chief financial officer of Vyaire Medical, a medical device company, from March 2020 to January 2022. She previously held the role of executive vice president and chief financial officer at Acelity, from June 2017 until it was acquired by 3M (NYSE: MMM) in October 2019. She also served as chief financial officer of G&K Services, a publicly traded uniform services company, from 2014 until it was acquired by Cintas (NDAQ: CINTAS) in 2017. Ms. Jokinen currently sits on the board of directors at Alamo Group (NYSE: ALG), Array Technologies (NDAQ: ARRY), and Candela Corporation.
>
> Qualifications:
>
> Ms. Jokinen is well qualified to serve on our Board because of her experience in the uniform service industry and her financial and board-level experience with publicly traded companies.

**Defendant McKee**

30. Defendant McKee has served as a Company director since the Spinoff. Previously, Defendant McKee served as Executive Vice President and Chief Human Resources Officer for Aramark from 2004 until 2022. Defendant McKee serves as a member of the Nominating, Governance and Corporate Responsibility Committee.

31. The 2026 Proxy Statement stated the following about Defendant McKee:

> Background:

Ms. McKee most recently served as executive vice president and chief human resources officer for Aramark from 2004 to 2022. Prior to this role, Ms. McKee held several key positions for Aramark from 1980 to 2004, including director of employee relations, vice president for corporate human resources, where she was responsible for executive development and compensation, and senior vice president for human resources of Aramark Global Food, Hospitality and Facility Services. In addition, Ms. McKee led Aramark's corporate communications, diversity, equity and inclusion, sustainability, community relations, corporate real estate and air and meeting services. Ms. McKee is currently a member of the board of directors of WSFS Financial Corporation (NASDAQ: WSFS) and Highmark Inc.

Qualifications:

Ms. McKee is well qualified to serve on our Board because of her extensive corporate experience in employment, compensation and benefits matters at the regional, national and international levels. In addition to her expertise in human resources, Ms. McKee brings crisis management, corporate governance, executive leadership and public company oversight skills.

**Defendant Meister**

32. Defendant Meister has served as a Company director since June 18, 2024. Defendant Meister currently serves as a member of the Audit Committee.

33. The 2026 Proxy Statement stated the following about Defendant Meister:

Background:

Keith Meister is the founder, Managing Partner and Chief Investment Officer, Corvex Management LP since 2010. Prior to founding Corvex, he served as Chief Executive Officer and then Principal Executive Officer and Vice Chairman of the Board of Icahn Enterprises from August 2003 to August 2010. From its launch in November 2004 to August 2010, he also served as Senior Managing Director of the General Partners of Icahn Partners LP and affiliated funds. Prior to joining the Icahn Organization, Meister served as Co-President of J Net Ventures from January 2000 through September 2001. Prior to launching J Net Ventures, he worked at NorthStar Capital and Lazard Freres. Mr. Meister currently serves as a director on the boards of GeneDx Holdings Corp., MGM Resorts International and Illumina, Inc., and previously served on the boards of Yum! Brands, Inc., The Williams Companies, the ADT Corporation, and Ralcorp Holdings, among others.

Qualifications:

Mr. Meister is well qualified to serve on our Board because of his operational and strategic expertise as managing partner and an executive officer of an investment firm and diversified holding company and his extensive boardroom experience.

**Defendant Pertz**

34. Defendant Pertz has served as a Company director and as the Vice Chairman of the Board since the Spinoff. Defendant Pertz also serves as the Chair of the Board's Compensation and Human Resources Committee and as a member of the Audit Committee.

35. The 2026 Proxy Statement stated the following about Defendant Pertz:

> Background:
>
> Mr. Pertz has served as the Vice Chairman of the Board of Directors since September 2023. He also served as the interim Lead Independent Director of Vestis from March 18, 2025 to June 1, 2025, Mr. Pertz previously served as the executive chairman of the board of The Brink's Company (NYSE: BCO), a global leader in total cash management and secure logistics, until his retirement in May 2023. Mr. Pertz also served as the president, chief executive officer and a member of the board of The Brink's Company from June 2016 to May 2022. Prior to Brink's, he served as president and chief executive officer of Recall Holdings, having led Recall from its initial public offering in 2013 to the strategic sale of the business in 2016. He previously also served as chief executive officer of several other public companies, including IMC Global (predecessor to Mosaic Co. (NYSE: MOS)) and Culligan Water Technologies. Mr. Pertz currently serves on the board of directors for Vital Records Control and previously served on the board of directors for Advance Auto Parts (NYSE: AAP).
>
> Qualifications:
>
> Mr. Pertz is well qualified to serve on our Board because of his operational expertise in branch and route-based logistics, business-to-business services, channel and brand marketing and growth through acquisition.

**Defendant Whitney**

36. Defendant Whitney has served as a Company director since the Spinoff. Defendant Whitney also serves as a member of the Audit Committee.

37. The 2026 Proxy Statement stated the following about Defendant Whitney:

> Background:
>
> Ms. Whitney has served as executive vice president and chief financial officer of Waste Connections (NYSE: WCN) since February 2021 and has more than 25 years of deep financial expertise. During her 19-year tenure at Waste Connections, Ms.

> Whitney has held executive-level finance roles, each with increased responsibilities, including senior vice president and chief financial officer from July 2018 to February 2021, senior vice president of finance, vice president of finance and director of finance. Previously, Ms. Whitney held various finance positions at Wheelabrator Technologies.
>
> Qualifications:
>
> Ms. Whitney is well qualified to serve on our Board because of her financial experience with publicly traded companies.

**Defendant Williams**

38. Defendant Williams has served as a Company director since the Spinoff. Defendant Williams also serves as a member of the Compensation and Human Resources Committee and the Nominating, Governance, and Corporate Responsibility Committee.

39. The 2026 Proxy Statement stated the following about Defendant Williams:

> Background:
>
> Ms. Williams has served as chief operating officer of Casey's General Stores (NASDAQ: CASY), one of the leading convenience store chains in the United States, since June 2020. She is responsible for store operations, operations support, information technology, real estate, construction & maintenance, asset protection and acquisition integration. During her tenure, she has also led supply chain and fuel operations. Prior to this role, Ms. Williams served as the chief executive officer and member of the board of directors of National HME, a technology enabled medical equipment provider, from January 2019 to March 2020. Ms. Williams also served as senior vice president and head of international operations for 7-Eleven, where she led the global growth strategy and had profit and loss responsibilities. Ms. Williams also held several positions in operations, retail, finance and planning for Mobil Oil Corporation and ExxonMobil Corporation (NYSE: XOM). Ms. Williams currently serves on the board of advisors for the Robert B. Rowling Center for Business Law and Leadership, at the SMU Dedman School of Law. She also serves on the board of directors for Children International and on the Dallas leadership committee for St. Jude.
>
> Qualifications:
>
> Ms. Williams is well qualified to serve on our Board because of her operational expertise and extensive industry and senior management experience.

**Relevant Non-Parties**

40. The operative complaint in the Securities Class Action incorporates statements from former employees of Vestis who offered their experiences as confidential witnesses.[2] The following are former employees whose statements are referenced throughout this complaint before this Court.

***CW1***

41. CW1 worked for Aramark and then the Company as a territory manager for the Southeast United States from June 2021 through May 2025. In this role, CW1 reported to general manager William Turner, who then reported to the Vice President of the Southeast Region Paul Schmid, who in turn reported to Defendant Scott.

42. In his role as territory manager, CW1 managed various aspects of the Company's operations, including overseeing routes, route service representatives ("RSRs"), customer complaints, and customer retention.

***CW2***

43. CW2 worked for the Company as a general manager designate from May 2024 through July 2024, and then as a general manager of production for the Company's Chicago production center from July 2024 through February 2025. In this role, CW2 reported to Regional Vice President Nanci Hunsinger, who reported to the Company's Chief Operating Officer Bill Seward, who in turn reported to Defendant Scott.

44. CW2 worked at the Company's third largest production facility, which supplied product for Chicago (central), Arlington Heights (north), and Mokena (south). CW2 managed the facility's whole operation, including the 80 to 100 employees who worked there.

[2] All former employees are referred to as masculine to preserve their anonymity.

***CW3***

45. CW3 worked for Aramark as a member of its Business Transition team in the fourth quarter of 2021 before transitioning to the Company's Enterprise Architecture team by the start of the Relevant Period until leaving the Company in the fourth quarter of 2024.

46. As a member of the Enterprise Architecture team, CW3 worked on projects ranging from supply chain activity to customer service and plant operations.

***CW4***

47. CW4 worked for the Company as a Plant Manager at the Odessa, Texas production center from January 2022 until December 2024. In this role, CW4 reported to general manager Clint Rogers, who reported to a regional manager.

48. In his role, CW4 stated his main task was to keep the production line moving, noting that "when the dirty product comes back from the RSRs, it gets unloaded. We sort through that. We wash it. We process. And then we turn it around, and then we load it for customers for the following day."

***CW5***

49. CW5 worked as an account executive at the Company from late January 2025 until June 2025. CW5 reported to sales manager Tyler Grissom, who reported to Director of Sales Alexandria Karpin, who reported to Senior Vice President of Sales Peter Rego, who in turn reported to Defendant Scott.

50. CW5 stated that he was in a sales-facing role and was responsible for generating new rental accounts, mostly consisting of SMEs.

***CW6***

51. CW6 worked for Aramark and then the Company as an account executive from March 2023 until March 2024, then transitioning to a regional sales executive from March 2024 until mid-August 2025. In this role, CW6 reported to regional sales manager Mark Wahl, who reported to the Regional Sales Manager for the Northeast, who then reported to Defendant Scott.

52. In his role, CW6 was responsible for creating business-to-business direct sales and rental sales for larger accounts in his region.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

53. By reason of their positions as officers, directors, and/or fiduciaries of Vestis and because of their ability to control the business and corporate affairs of Vestis, the Individual Defendants owed Vestis and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Vestis in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Vestis and its shareholders so as to benefit all shareholders equally.

54. Each director and officer of the Company owes to Vestis and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

55. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Vestis, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

56. To discharge their duties, the officers and directors of Vestis were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

57. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Vestis, the absence of good faith on their part, or a conscious disregard for their duties to the Company and its shareholders that the Individual Defendants were aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company was known to, authorized, approved, ratified, and/or permitted by the other Individual Defendants serving on Vestis's Board at the relevant times.

58. As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this amended complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

59. To discharge their duties, the officers and directors of Vestis were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Vestis were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Georgia, and the United States, and pursuant to Vestis's own Business Conduct Policy (the "Code of Conduct") and Code of Ethics for Senior Financial Officers (the "Code of Ethics");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Vestis conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Vestis and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Vestis's operations would comply with all applicable laws and Vestis's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

60. Each of the Individual Defendants further owed to Vestis and the shareholders the duty of loyalty requiring that each favor Vestis's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

61. At all times relevant hereto, the Individual Defendants were the agents of each other and of Vestis and were at all times acting within the course and scope of such agency.

62. Because of their advisory, executive, managerial, directorial, and controlling positions with Vestis, each of the Individual Defendants had access to adverse, non-public information about the Company.

63. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Vestis.

**<u>CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION</u>**

64. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with

and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

65. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

66. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Vestis was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

67. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the

accomplishment of that wrongdoing, and was aware of or consciously disregarded his or her overall contribution to and furtherance of the wrongdoing.

68. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Vestis and was at all times acting within the course and scope of such agency.

## VESTIS'S CODE OF CONDUCT AND CODE OF ETHICS

***Code of Conduct***

69. Vestis's Code of Conduct represents that it "supports [Vestis's] commitment to earn [] trust and helps guide us to ensure our actions reflect the highest standards of integrity. The [Code of Conduct] applies to all of us-including teammates, senior leaders, our board of directors, and anyone acting on Vestis's behalf. Each of us is responsible for protecting Vestis's integrity and reputation."

70. In the section, "The BCP Applies to Everyone" the Code of Conduct in relevant part, states:

> THOSE WHO FAIL TO COMPLY with the BCP, fail to disclose suspected violations, fail to cooperate with an investigation of a possible violation, or knowingly make a false report may be subject to disciplinary action up to and including termination of employment.

71. In the section "Compliance with the Laws" the Code of Conduct states:

> It is Vestis's policy to comply with the laws in each country, state, and locality in which Vestis conducts business. This includes, but is not limited to, compliance with employment, labor, and workplace rules; data privacy, cybersecurity, environmental, antitrust, gifts and entertainment, and securities laws; and the United States Foreign Corrupt Practices Act, and other anticorruption/ anti-bribery laws. Every Vestis teammate and any person or entity acting on Vestis's behalf must adhere to the restrictions and standards imposed by those laws and regulations.

72. In the section "Accurate Books and Reporting" the Code of Conduct states:

> We must ensure that our books and records are complete, accurate, honest, and timely. You must never falsify, or ask or cause someone else to falsify, company

> books or records or customer documentation by making false entries through deliberate omission, or by creating records without knowledge of their accuracy. All expense reports, accounts payable, invoice transmittals, inventory summaries, customer billing data, payroll data, and any other similar documents or records must be complete, accurate, honest, and timely. You may not open or maintain any undisclosed or unrecorded corporate account, fund, or asset or any account with a misleading purpose.
>
> You must not provide false or misleading information to anyone, including the Vestis Legal Department, Vestis's Internal Audit Department, or our independent auditors.

***Code of Ethics***

73. Vestis's Code of Ethics is intended "to promote honest and ethical conduct, and adherence with the law." The Code of Ethics "applies to the Corporation's principal executive officer, principal financial officer, principal accounting officer and all Vice Presidents and above in the Corporate Finance and Corporate Accounting Departments (collectively the 'Senior Financial Officers')."

74. The Code of Ethics states that:

> Senior Financial Officers shall:
>
> - Engage in and promote honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;
> - Produce, or cause to be produced, full, fair, accurate, timely, and understandable disclosure in reports and documents that the Corporation files with, or submits to, the Securities and Exchange Commission and in other public communications made by the Corporation;
> - Comply with applicable governmental laws, rules and regulations, as well as the rules and regulations of self-regulatory organizations applicable to the Corporation;
> - Take all reasonable measures to protect the confidentiality of the Corporation's non-public information and that of its customers obtained or created in connection with their activities and to prevent the unauthorized disclosure of such information unless required by applicable law or regulation or for legal or regulatory purposes;

- Promptly report violations of this Policy as provided below; and
- Be held accountable for adherence to this Policy.

75. In violation of the Code of Conduct and Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of the Exchange Act, and the aiding and abetting thereof. Also, in violation of the Code of Conduct and Code of Ethics, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Conduct, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Codes of Conduct and Code of Ethics.

## VESTIS'S AUDIT COMMITTEE CHARTER

76. Vestis also maintains an Audit Committee Charter (the "Audit Committee Charter") which governs the Audit Committee's roles and responsibilities. The Audit Committee charter states the following regarding the purpose of the Audit Committee:

> The Audit Committee shall assist the Corporation's Board of Directors (the "Board") in its oversight of: the performance of the Corporation's internal audit function and the independent auditors; the accounting, reporting and financial practices of the Corporation, including the quality and integrity of the Corporation's financial statements, including internal controls; the qualifications and independence of the independent auditors; the Corporation's compliance with legal and regulatory requirements; risk assessment and management; and the Corporation's information technology ("IT") functions and security program. The Committee shall also prepare an audit committee report as required by the Securities and Exchange Commission (the "SEC") to be included in the Corporation's annual proxy statement.
>
> In fulfilling their responsibilities hereunder, it is recognized that members of the

> Committee are not, and do not represent themselves to be, accountants or auditors by profession or experts in the fields of accounting or auditing, including in respect of auditor independence. In addition, notwithstanding the Committee's purposes set forth above, the Committee is not responsible for certifying the Corporation's financial statements or guaranteeing the auditor's report. The fundamental responsibility for the Corporation's financial statements and disclosures rests with management. The Committee may carry out additional functions and adopt additional policies and procedures as may be appropriate in light of changing business, legislative, regulatory, legal or other conditions. The Committee shall also carry out any other responsibilities and duties delegated to it by the Board from time to time related to the purposes of the Committee set forth in this charter.

77. Under the heading "Functions, Powers and Responsibilities" in a subsection titled "Financial Reporting" the Audit Committee Charter states:

> 1.Meet to review and discuss with management and the independent auditors prior to public dissemination the Corporation's annual audited financial statements and quarterly financial statements, including: (A) the profit and loss statement, the balance sheet and statement of cash flows including variances and changes therein, (B) an analysis prepared by management and/or the independent auditor, setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, (C) the Corporation's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," including accounting policies that may be regarded as critical; and (D) major issues regarding the Corporation's accounting principles and financial statement presentations, including any significant change in the Corporation's selection or application of accounting principles and financial statement presentations; and receive reports from the independent auditors as required by SEC and/or Public Company Accounting Oversight Board (PCAOB) rules.
>
> 2. Review with management and discuss the Corporation's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies, including the type and presentation of information, paying particular attention to any pro forma or adjusted non-GAAP information. Such discussions may be in general terms (i.e., discussion of the types of information to be disclosed and the type of presentations to be made).
>
> 3. In consultation with the independent auditors, management and the internal auditors, review the Corporation's financial reporting processes and accounting standards and principles.
>
> 4. Review periodically the effect of regulatory and accounting initiatives, as well as off-balance sheet structures (if any), on the financial statements of the Corporation.

> 5. Review with the independent auditors and the Vice President, Internal Audit: (i) any audit problems or other difficulties encountered by the auditor in the course of the audit process, including any restrictions on the scope of the independent auditor's activities or on access to requested information, and any disagreements with management, and (ii) management's responses to such matters. Without excluding other possibilities, the Committee may wish to review with the independent registered public accounting firm (i) any accounting adjustments that were noted or proposed by such firm but were "passed" (as immaterial or otherwise), (ii) any communications between the audit team and the audit firm's national office respecting auditing or accounting issues presented by the engagement and (iii) any "management" or "internal control" letter issued, or proposed to be issued, by the independent registered public accounting firm to the Corporation.
>
> 6. Recommend to the Board whether the Corporation's annual financial statements should be included in the Annual Report on Form 10-K.
>
> 7. Review and approve all reports and disclosure with respect to matters related to the Committee required to be included in the Corporation's Form 10-K or proxy statement, as applicable, pursuant to applicable rules and regulations of the SEC.
>
> 8. Review with the General Counsel legal matters that may have a significant impact on the Corporation's financial statements.
>
> 9. Review any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal controls.

78. Under the same heading, in the subsection titled "Accounting Controls and Personnel" the Audit Committee Charter states:

> 1.Review the adequacy and effectiveness of the Corporation's internal controls over financial reporting, including any significant deficiencies or material weaknesses in and significant changes to internal controls reported to the Committee by the independent auditors or management. Review any special audit steps adopted in light of material control deficiencies and the adequacy of disclosures about changes in internal control over financial reporting.
>
> 2. Discuss with management and the independent auditors the Corporation's guidelines and policies with respect to risk assessment and risk management. While it is the responsibility of senior management to assess and manage the Corporation's exposure to risk, the Committee shall discuss the Corporation's major financial risk exposure and the steps management has taken to monitor and control such exposures, including without limitation insurance.
>
> 3. Periodically review, with the independent auditor, the internal audit function's

> responsibility, budget, staffing, the scope and results of internal auditing procedures, and performance. Annually review and recommend changes (if any) to the internal audit charter.
>
> 4. Review and concur on the appointment, compensation, removal and replacement of the Vice President, Internal Audit. The Vice President, Internal Audit shall report to the Committee and administratively to the Chief Financial Officer.
>
> 5. Set clear hiring policies for the Company's hiring of employees or former employees of the independent auditors. At a minimum, these policies must provide that any independent registered public accounting firm may not provide audit services to the Corporation if the CEO, controller, CFO, chief accounting officer or any person serving in an equivalent capacity for the Corporation was employed by the independent registered public accounting firm and participated in any capacity in the audit of the Corporation during the one-year period preceding the date of the initiation of the audit.
>
> 6. Review and evaluate the strategy with respect to and adequacy of the Corporation's IT functions and security program, compliance and controls. Review the Corporation's IT functions and security controls with management and, at least annually, with the Board.
>
> 7. Consider the risk of management's ability to override the Company's internal controls.
>
> 8. Review and assess the scope and readiness of the Company's business continuity plans.

79. Under the same heading in a subsection titled "Business Conduct and Ethics" the Audit Committee Charter states:

> 1. Establish procedures for: (i) the receipt, retention and treatment of complaints received by the Corporation regarding accounting, internal accounting controls or auditing matters; and (ii) the confidential, anonymous submission by employees of the Corporation of concerns regarding questionable accounting or auditing matters.
>
> 2. Monitor compliance with the Corporation's Business Conduct Policy and review and approve any requests for waivers of the Business Conduct Policy for executive officers and directors.
>
> 3. Establish, maintain and administer a policy with regard to related party transactions. Discuss with the independent registered public accounting firm its evaluation of the Company's identification of, accounting for, and disclosure of its relationships with related parties as set forth under the standards of the PCAOB.

> 4. Conduct investigations of allegations of management misconduct or other matters within the Committee's scope of responsibilities when deemed necessary or desirable.
>
> 5. Discuss with management the Corporation's guidelines and policies with respect to the use of artificial intelligence and associated risk management.

80. In violation of the Audit Committee Charter, Defendants Jokinen, Meister, Pertz, and Whitney conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, Defendants Jokinen, Meister, Pertz, and Whitney failed to adequately review the Company's financial reporting and disclosures, exercise their risk-management and oversight responsibilities, and review the adequacy and effectiveness of the Company's internal controls as required by the Audit Committee Charter.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background on Vestis

81. Vestis, headquartered in Roswell, Georgia, is the product of the Spinoff, which was the September 2023 separation by Aramark, a global provider of food and facilities services, of its AUS segment into Vestis, an independent public company. Vestis focuses primarily on the production, sale, and delivery of workplace supplies. Among other things, the Company offers uniforms, towels, and various restroom and first-aid supplies. Vestis's primary customer bases consist the following sectors: manufacturing, hospitality, retail, food processing, automotive and healthcare. A significant portion of the Company's customer base consists of repeating customers

who sign contracts with lengthy durations. Most of the Company's customers comprise of small-to-medium enterprise ("SME") businesses.

82. In the 2024 Fiscal Year, the Company reported revenue generation of roughly $2.8 billion, as well as operating income of $158 million (roughly 5.6% of revenue) and a net income of $21 million (roughly 0.7% of revenue). With regard to macroeconomic trends, the Company's Annual Report on Form 10-K filed with the SEC for the 2024 Fiscal Year (the "2024 10-K") stated that "the diversity of our customer base and the variety of industries in which our customers participate results in relatively low exposure to discrete industry trends." On a geographic basis, roughly 91% of the Company's revenue in the 2024 Fiscal Year derived from sales within the United States, while roughly 9% of the Company's revenue in the 2024 Fiscal Year derived from sales in Canada.

83. The Company uses various systems in order to track its customer satisfaction rates, production, and sales data, including, *inter alia*, Salesforce (a customer relationship management software), ABS (the Company's route accounting tool it took from the Spinoff), Microsoft Power BI and Tableau (business integration platforms), Spindle (software used in commercial laundry plants), and Oracle (an enterprise resource planning software).

84. The Company utilized Salesforce to assist with customer contact management, lead-tracking, and real-time sales reports, including sales team performance and sales forecasts. ABS was utilized as the Company's operating system which provided the Company with a "standardized common platform for all of our facilities to operate off of[.]" Defendant Scott described ABS at the Company's Analyst Day on September 13, 2023 as "one place to house all of our data and information about our customers to see the movement of our routes so that we can understand how efficient we're being[.]" Spindle was utilized as a means for allowing data

collection from plant equipment automatically. Tableau was used to track and report the Company's plant operations, among other guidelines.

***The Company's Business Acquisition Process***

85. Vestis is a "route-based business" focused on the business-to-business market. The route-based business dispatches RSRs, from one of the Company's laundry plants or "market centers" to deliver the Company's services and products to customers. The Company sells itself through various channels, including sales team RSRs, telemarketing, territory managers, and digital platforms. Upon acquiring a new contract, the Company begins the process of a new customer installation.

86. For rental customers, the Company provides its services on a recurring basis, typically weekly, which includes: (1) delivering clean uniforms; (2) picking up the worn uniforms for inspection, cleaning, and repair or replacement; (3) picking up soiled floor mats, towels and linens; and (4) restocking supplies, such as restroom and first-aid supplies, as needed.

87. Upon a new customer being acquired, the customer's file would be passed on to a New Business Install Manager ("NBIM"). According to CW3, the NBIM would then meet with the customer to receive sizing, including pant and shirt sizes as well as the number of mats or napkins needed, and input that data into Salesforce. Upon the NBIM approving the order, the order would be passed on to the stockroom managers who, according to CW3, would "do some processes in ABS [the Company's route accounting system brought over from Aramark in the Spinoff]." From there, orders would be sent to distribution centers through the ABS, who would process the garments and send them to the stockroom managers to unpack, hang, review the garments, and prepare them for installation (delivery to the new customer). According to CW3, the installation

would be prepared by either the route driver, salesperson, or NBIM based "on the size of the account."

***The Company's Strategic Growth Plan was Intended to Promote Customer Service and Executive Oversight but Many Issues Plagued the Company***

88. At the Company's Analyst Day on September 13, 2023, before the start of the Relevant Period, the Individual Defendants introduced the Company's strategic plan to grow the Company. The plan aimed to provide: (1) high-quality revenue growth; (2) efficient operations; (3) disciplined capital allocation; and (4) a performance-driven culture.

89. The plan aimed to provide high-quality revenue growth by providing customers with seamless service. This was expected to be accomplished through data analytics which would, as described by Defendant Scott, "really trend customer behaviors and understand what's happening with that customer so that we can provide excellent service to them." The growth would also require the Company's RSRs to cross-sell Company products to pre-existing customers as a means of increasing revenue.

90. The efficient operations aspect of the plan was meant to include cutting down on the Company's operations costs, including labor, merchandise in service costs, plant operating costs, and service-related costs. The strategy contemplated that the Company would cut back on merchandising costs by reusing garments and products so as to avoid needing to acquire new products. One method the Company sought to accomplish this by was by providing new employees of customers with previously worn outfits from a departed employee who was approximately the same size.

91. However, this so-called efficiency came at the expense of customer satisfaction. Indeed, even before the Relevant Period, the Company began to experience significant customer losses as the result of service-related issues. Among the issues customers flagged were "on-time

delivery and stopping shortages and delivering full loads to customers," as reported on the earnings call held to discuss the financial results for the second quarter of the 2024 Fiscal Year (the "2QFY24 Earnings call").

**The Company's Service Issues Continued into the Relevant Period**

92. The Company's issues with customer service persisted into the Relevant Period.

93. For example, the Company experienced inventory backlogs which, according to CW1, resulted in the Company regularly "short[ing]" its customers' orders. CW1 further reported that throughout CW1's tenure, the Company would receive "constant complaints" from customers as the result of these shortages. CW1 noted that customers never received "100% service" from Vestis, with some instances where a customer would give the Company five pants and five shirts but only receive "three and four back the next week."

94. CW6 also noted that as a result of the product shortages, in addition to customers not receiving enough product, shipments were frequently delayed, if not missed completely. As CW6 stated, customers would personally complain regarding product shortages "every week" in addition to missing deliveries "several times a month."

95. CW1 also identified that ordering new products was ineffective, as the Company's backlog was so extensive that new product would be coming, but he would "never see it" and "even when they did inject new stuff, it didn't make a difference, because we're so far behind." Notably, CW1 also reported that the Company's Merchandise Control Managers ("MCMs") would "hold orders," as a method of cost control, with each route having its own "piece budget" which was an allotted amount of new product to replenish inventory. Notably, the MCMs would "go through the orders every morning, and they would decide what order would get pushed through and which orders would be held and which orders would be kicked back." Even when utilizing the

ABS, CW1 recounted entering orders "right in front of the customer," but that "orders would just disappear out of the system."

96. As a result, CW1 complained that shortages were a necessity because "the only way you could operate was cutting. You're robbing from Peter to pay Paul every day." Notably, CW1 stated that to provide one customer with "100% this week," he would have to short that customer the following week so as to provide a different customer with 100%. CW1 noted that he never "had a 100% load," i.e. an instance in which one of the trucks on CW1's routes that had 100% of the product necessary to fill every order.

97. In addition to product shortages, customers frequently complained about the product quality from Vestis. As explained by CW1, the Company's general managers would reuse existing stock as opposed to ordering new uniforms as a means of cutting down on one of the Company's larger expenses. Notably, when the Company had low inventory, it would allow for lower grading of its uniform supply. In those instances, CW1 would have to "take something that probably shouldn't have been taken and try to deliver to customers," noting that this would result in CW1 having "to reorder it because it would look like garbage," and resulting in the customer's installation being delayed. This also upset the customers.

98. CW5 identified that when receiving customer feedback, customers frequently mentioned product quality issues, including that the uniforms were not being cleaned. RSRs would report to CW5 that they were receiving similar complaints of customers' products not being cleaned. The product quality issues were so extensive that CW2 recalled restaurants receiving white linens that had stains, mold spots, or holes.

99. In addition to the product quality issues causing delays, the Company's facilities also facilitated delays. Notably, the Company had failed to make any required facility

improvements to its facilities, including investing in new equipment and repairing existing equipment. As a result, the Company's facilities frequently experienced fires which caused delays. CW5 described the Company's facilities as outdated, dirty, and like a "sweat shop."

100. According to CW2, the Company's facility in Chicago had been subject to "years upon years of neglect," noting that half of the Company's equipment wasn't working at any given time. CW2 continued by noting that the Company would not invest in new equipment "even when problems were raised to leadership."

101. Similarly, CW4 attributed "much" of the Company's productivity issues to the "outdated machinery," noting that "there's equipment in some of these plants that's older than I am." CW4 noted the difficulties in trying to acquire new equipment, stating that "trying to get new equipment is like pulling teeth." CW4 further noted that "before I left, we got a brand new washer, and all the other ones are like 30 years old. So we have one brand new washer and then four that are 30 years old."

102. This older equipment contributed to fires breaking out at various Company facilities. According to CW2, fires would happen almost monthly during the summer between May or June until October 2024. CW2 noted that there were so many fires, he was surprised that "the place hasn't burned down."

103. Notably, CW2 said the fires were due to the laundry operations being inherently dangerous, with flammable materials, including greasy towels from restaurants "spontaneously" bursting into flames if left, in its worn state, hanging on or in dryers for too long. The following images are from the Chicago Fire Department's response to a dryer fire in October 2024:





104. According to CW2, fires extended beyond just the Chicago plant, recalling a training in Riverside, California where "I remember in the parking lot, there was a big black mark," and "they said, oh yeah, that's where we had a big fire a couple months ago where a trailer burned down to the ground."

105. CW2 also recalled the Company running out of space due to "bulk fold and ironing was backed up," with delays at the bulk fold sometimes lasting "a day or two." According to CW2, this created issues because "if you are washing it and then your irons can't keep up, it sits in the air waiting in a buffer area," and "if you're not washing it, it sits in dirty state." As a result of these delays, CW2 stated that dirty items would often be left outside, and that the items left outside would then need to be thrown away because "you couldn't resalvage it through the wash process." CW2 shared the following images of the product left outside:





106. All of these inefficiencies meant that the Chicago plant "was always behind." CW2 noted that the floor at Chicago "was very capable of doing 800,000 to a million pounds a week if it was maintained correctly," but that "we were doing somewhere around 600,000 if we were lucky."

***The Company's Sales Personnel Deceived New Customers While Installation Inefficiencies are Also Delayed***

107. Even new customers were not exempt from the service issues. Even the creation of the Company-client relationship had issues. For example, CW5 revealed that the Company's client relationships all begin with a service term, which was governed by a form service agreement. However, because the Company was aware many small to medium businesses would not want to enter into long-term "contracts," the Company's sales people were instructed to use the term "service agreement" instead. CW5 stated that in the event a customer ever asked whether they

were required to enter into a contract, salespeople were instructed to "flat out lie" and state "oh no, it is a service agreement."

108. Further, the Company's fulfillment timeline once the new customers were being installed exceeded most industry standards. CW3 explained that, throughout his tenure, the Company's install times was "on a very regular basis, the actual install was in excess of" the regular 20 to 30-day industry standards. CW3 noted that their install times "would kind of ebb and flow," with 45 days being the average, although there were some instances where "60 days was probably true for some customers."

109. CW3 claimed that many of these delays were the result of the Company's handoff process upon installation. Notably, CW3 stated that "there was a pretty decent gap between the time when the contract was signed and when the salesperson would hand that folder off" to the NBIM. CW3 also recalled frequent incomplete information, which required the install team to have to go back to sales.

110. Another source of delay was emblems, or a customer's logo and employee name patches, due to the market centers having a "manual process" to order emblems, which meant that distribution centers would have "to wait days for the emblems to arrive" despite the distribution centers having the product.

***The Company Began Receiving Customer Complaints and Offering Credits to Appease Customers***

111. As a result of the shortages and delays, customers began to seek relief through the Company's complaint process.

112. CW1 described the complaints from customers as coming "every day," noting that Customers felt the Company was not "hold[ing] up" its "end of the bargain."

113. In addition to product shortages, CW2 recalled receiving "frequent complaints' about floor mats, especially in the winter, and that "we never had enough mats." CW1 recounted that RSRs were forced to bear the brunt of the complaints, as they were most forward facing, with customers even yelling at RSRs as a result of the shortages. Because of this, RSRs were not cross-selling new products, despite the Company's success plan.

114. CW4 noted that all customer complaints were handled in ABS. In addition, customers were able to file complaints directly on the Company's website, which would then "send an email to the service team, and they would get it." Territory managers or RSRs were the first line of defense for responding to customer complaints, and the general managers would get involved if the issue was escalated.

115. CW1, operating as a territory manager, described that customers would need to submit a formal service request, which entailed submitting a certified letter, in order to remedy any service issues. CW1 then revealed that "if they would submit a service request and complain, that's the way that they would be able to get that product."

116. In order to compensate customers who complained for service failures, the Company would utilize credits. CW1 explained that when the Company was unable to deliver enough product in one week, the customer could then request a credit on their contract. However, CW1 also noted that the Company wanted territory managers "to do whatever we could to where we did not have to issue a credit," with credits being considered "the last-ditch effort."

117. As a result, the credit approval process was rigorous, with territory managers having to submit credit requests with "detailed explanations," in Express Desk, which was a software that tracked customer credits. From there, the credit would need to be approved by general managers, the credit review team, and then either the Company's Chief Operating Officer or

Defendant Scott. In addition, the general managers would try and get vice presidents involved so the credit requests weren't "kicked back," meaning it could take "a week before you could actually get a credit approved." This process would apply to all credits, except for those for national accounts which were billed based on usage. Ultimately, the credit approval process boiled down to whether management "thought it was something that was worth it or not." CW1 explained that, apart from the national accounts, customers were more likely to get credits approved when they were considered Accounts in Jeopardy ("AIJ"). CW1 identified that AIJ were accounts which were either "about to come up on a renewal" or "have issues and threatening to quit."

118. CW2 recalled that these complaints and credits were frequently discussed on weekly calls, noting that leadership would flag national accounts and "they would bring it up and say, hey, the plants need to start watching Cheesecake Factory. Sales, please go give them some love."

119. In attempts to prevent customers from cancelling contracts, the Company had strict procedures built into customer contracts. In attempts to avoid navigating these processes, customers instead would frequently lower their orders to the contractual minimum permitted under their contracts, while others would attempt to deviate from contracts, such as lowering the invoice minimums.

120. In order to monitor deviations, Defendant Scott's approval was required for any change. As such, CW1 reported that the process caused customers to leave or lower their orders to the invoice minimum, by as much as 75% of regular order volume. CW1 estimated that approximately 10-20% of the customers in CW1's territory reduced their order volume to invoice minimums.

121. For customers who chose to navigate the cancellation process, it was a "slow and difficult" process. According to CW1, customers would have to send a certified letter, and the Company would then have 30 days to begin addressing the issue. CW2 stated that upon a customer sending a letter, it was "usually too late to repair the relationship," with "many" letters ending up with legal.

122. CW1 stated that in attempts to avoid this process, a "majority of the time, they would just try to agree upon a buyout," noting that "the customer gets so fed up that they're just willing to eat that cost to be done."

123. CW1 stated that the buyout amount varied to approximately 25-50% of the remaining balance on the contracts or, alternatively, paying liquidated damages. Typically, the Company would identify the largest amount and "just negotiate from there."

124. CW1 reported that the customer retention in his territory "was always going down" and it "always seemed like we were losing more than we were gaining." Notably, CW1 revealed that the losses outweighed the gains, with the gains being only "small customers that were $25 or $50 a week," with that CW1's territory being "in a big hole" and "all of the large customers were just quitting."

***The Company Undergoes a Change in Leadership as the Result of the Continuing Service Issues***

125. On March 18, 2025, the Company announced the departure of Defendant Scott from her positions as President and CEO of Vestis, effective on the same date. Defendant Scott also left her position as a Company director effective March 18, 2025. The press release announcing Defendant Scott's departure stated that "the Board of Directors of Vestis Corporation . . . determined that Kim Scott, President and Chief Executive Officer, will leave her positions with the Company effective March 18, 2025. Ms. Scott also resigned from the Company's Board of

Directors on March 18, 2025." The press release also announced Defendant Holloman would be taking over as interim Executive Chairman, President, and CEO until a new CEO could be appointed.

**False and Misleading Statements**

***May 2, 2024 Press Release***

126. On May 2, 2024, the Company issued the 2QFY24 Press Release, reporting its financial results for the second quarter of the 2024 Fiscal Year.

127. In discussing the Company's short-term challenges in the 2024 Fiscal Year, the 2QFY24 Press Release quoted Defendant Scott as stating "operating trends are improving across our business."

128. The statement referenced and identified in ¶ 127 was false and misleading because they failed to disclose, *inter alia*, that: (1) the operational deficiencies and product shortages the Company was experiencing prior to the start of the Relevant Period were not improving; (2) these issues caused the Company to delay new customer installations and prevented the Company from properly servicing its existing customers; and (3) the resulting customer dissatisfaction resulted in customers seeking credits, lowering invoice minimums, and pursuing cancellations, deviations, and buyouts. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

***November 21, 2024 Earnings Call***

129. On November 21, 2024, the Company held an earnings call with investors and analysts to discuss the Company's fourth quarter and year-end financial results for the 2024 Fiscal Year (the "FY24 Earnings Call").

130. During the FY24 Earnings Call, an analyst from Goldman Sachs asked "And then with respect to customer service, approximately what proportion of your branches is hitting your desired goals? And how long do you think it will take for the rest of your operations to achieve sufficient service quality?" Defendant Scott responded by stating, in relevant part:

> Yes. So we have pockets of outstanding performance. So there are opportunities always to improve, and we will do that in every location. But I will tell you, ***we're seeing the level of performance rise across the system with particular focus on those locations that are underperforming versus the norm***. Our goal is to raise the entire bar for the whole organization. ***We're seeing that happen on-time delivery already***.

131. The statement referenced and identified in ¶ 130 was false and misleading because they failed to disclose, *inter alia*, that: (1) the operational deficiencies and product shortages the Company was experiencing prior to the start of the Relevant Period were not improving; (2) these issues caused the Company to delay new customer installations and prevented the Company from properly servicing its existing customers; and (3) the resulting customer dissatisfaction resulted in customers seeking credits, lowering invoice minimums, and pursuing cancellations, deviations, and buyouts. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

***December 16, 2024 Proxy Statement***

132. On December 16, 2024, the Company filed the 2024 Proxy Statement with the SEC. The 2024 Proxy Statement was solicited by Defendants Scott, Holloman, Burke, Goetz, Jokinen, McKee, Meister, Pertz, Whitney, and Williams, pursuant to Section 14(a) of the Exchange Act, and contained materially false and misleading statements.

133. The 2024 Proxy Statement solicited shareholders to vote to, *inter alia*: (1) re-elect Defendants Goetz, McKee, Meister, and Pertz as Class I directors for two-year terms; (2) vote to approve, on an advisory basis, named executive officer compensation; (3) vote to approve, on an

advisory basis, the frequency of future advisory votes to approve named executive officer compensation; and (4) vote to ratify the appointment of Deloitte & Touche LLP as the Company's independent registered public accounting firm.

134. With respect to the Code of Conduct and Code of Ethics, the 2024 Proxy Statement stated, in relevant part:

> We maintain a Code of Ethics for Senior Financial Officers that is applicable to our Chief Executive Officer, Chief Financial Officer, Principal Accounting Officer and other senior financial officers. The code requires our senior financial officers to engage in and promote honest and ethical conduct and produce full, fair, accurate, timely and understandable disclosure in reports and other documents we file with the Securities and Exchange Commission and in other public communications. Our senior financial officers may not, among other things, take any action to fraudulently influence, coerce, manipulate or mislead our independent public accountants for the purpose of rendering our financial statements materially misleading. The code promotes compliance with applicable laws, prompt internal reporting of violations and accountability for adherence to the code.
>
> We also maintain a Business Conduct Policy that applies to all our employees and sets forth our policies and expectations on a number of topics, including conflicts of interest, confidentiality, compliance with laws (including insider trading laws), preservation and use of our assets, and business ethics. The Business Conduct Policy sets forth procedures for addressing potential conflicts of interest (or the appearance of a conflict of interest) and for the confidential communication and handling of issues regarding accounting, internal control and auditing matters.

135. In a section titled "Board of Directors' Role in Risk Oversight," the 2024 Proxy Statement stated the following:

> Our management is responsible for day-to-day risk management activities. Our Board, acting directly and through its committees, is responsible for the oversight of our risk management.
>
> The Audit Committee periodically reviews our accounting, reporting and financial practices, including the integrity of our financial statements, the surveillance of administrative and financial controls and our compliance with legal and regulatory requirements. In addition, the Audit Committee reviews risks related to compliance with ethical standards, including our Business Conduct Policy (discussed below), and our approach to enterprise risk management and operational risks, including those related to information security and system disruption. With respect to cybersecurity, the Audit Committee monitors our cybersecurity risk profile, receives periodic updates from management on all matters related to cybersecurity

> and reports to our full Board. Through regular meetings with management, including the accounting, finance, legal, information technology and internal audit functions, the Audit Committee reviews and discusses the risks related to its areas of oversight and reports to our Board with regard to its review. The Compensation Committee oversees compensation-related risk management. The Nominating Committee oversees risks associated with the structure of our Board and other corporate governance policies and practices. The Compensation and Nominating Committees also regularly report their findings to our Board.
>
> Our Chief Executive Officer and other executive officers regularly report to the non-executive directors and the Audit, Compensation and Nominating Committees to ensure effective and efficient oversight of our activities and to assist in proper risk management and the ongoing evaluation of management controls. In addition, our Board receives periodic detailed operating performance reviews from management. Our Vice President of Internal Audit reports functionally and administratively to our Chief Financial Officer and directly to the Audit Committee. We believe that the leadership structure of our Board provides appropriate risk oversight of our activities.

136. The 2024 Proxy Statement was materially misleading because it failed to disclose, *inter alia*, that contrary to the 2024 Proxy Statement's descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements to the investing public.

137. The 2024 Proxy Statement also failed to disclose, *inter alia*, that: (1) the operational deficiencies and product shortages the Company was experiencing prior to the start of the Relevant Period were not improving; (2) these issues caused the Company to delay new customer installations and prevented the Company from properly servicing its existing customers; and (3) the resulting customer dissatisfaction resulted in customers seeking credits, lowering invoice minimums, and pursuing cancellations, deviations, and buyouts. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

138. As a result of the material misstatements and omissions contained in the 2024 Proxy Statement, Company shareholders: reelected Defendants Goetz, McKee, Meister, and Pertz to the Board, thereby allowing them to continue to breach their fiduciary duties to Vestis; (2) approved, on an advisory basis, named executive officer compensation; (3) approved, on an advisory basis, the frequency of future advisory votes to approve named executive officer compensation; and (4) ratified the appointment of Deloitte & Touche LLP as the Company's independent registered public accounting firm.

**The Truth Emerges**

***May 6, 2025 Financial Reports***

139. On May 6, 2025, the truth emerged when Vestis issued a press release concerning its financial results for the second quarter of the 2025 Fiscal Year (the "2QFY25 Press Release"). The 2QFY25 Press Release reported that the Company's revenue had declined "primarily" due to "lost business in excess of new business," in addition to a $15 million "bad debt" expense. The 2QFY25 Press Release quoted Defendant Holloman as stating he was "disappointed with our second quarter results[.]"

140. The 2QFY25 Press Release stated, in relevant part:

> **Second Quarter 2025 Financial Performance**
>
> Second quarter fiscal 2025 revenue totaled $665.2 million, a decrease of $40.1 million year over year, and the company generated an operating loss of $8.6 million during the period, a decrease of $51.6 million when compared with operating income in the second quarter of 2024. ***The decline in revenue was primarily due to a $17.5 million decline from lost business in excess of new business***, a $5.8 million decline in revenue related to existing customers, and a $6.8 million decrease in direct sales primarily driven by the loss of a national account customer. In addition, the second quarter of fiscal 2024 included approximately $5.0 million of revenue from one-time customer exit billings that did not repeat in fiscal 2025. Cost of services decreased $14.4 million year over year, as a result of lower volume.

* * *

> Adjusted EBITDA was $47.6 million for the second quarter of 2025 and excluding ***a $15.0 million one-time adjustment for bad debt expense*** was $62.6 million or 9.4% of revenue as compared to $87.2 million, or 12.4% of revenue in the second quarter of 2024.

(Emphasis in the heading in original).

141. The 2QFY25 Press Release also revealed that the Company was withdrawing its financial guidance for the 2025 Fiscal Year, only issuing guidance for the upcoming third quarter. The 2QFY25 Press Release stated, in relevant part:

> **Revised Outlook and Third Quarter Guidance**
>
> The Company expects fiscal third quarter 2025 revenue to be in the range of $674 million to $682 million and fiscal third quarter 2025 Adjusted EBITDA to be at least $63 million. In shifting to quarterly guidance, the Company is not providing full-year guidance for fiscal 2025.

(Emphasis in original).

142. That same day, the Company filed its quarterly report on Form 10-Q with the SEC for the second quarter of the 2025 Fiscal Year (the "2QFY25 10-Q"). The 2QFY25 10-Q revealed that the $15 million "bad debt" expense was due to an "adjustment to the allowance for credit losses during the three and six months ended March 28, 2025 based on ***updated estimates of collectability*** and to ensure the adequacy of the allowance for credit losses."

143. In anticipation of the earnings call the following day, also on May 6, 2025, the Company published a presentation to assist with discussion on the call (the "2QFY25 Earnings Presentation").

144. Regarding how the Company's lost business was outpacing the growth from new customers, the 2QFY25 Earnings Presentation included the following slide:




***May 7, 2025 Earnings Call***

145. The following day, on May 7, 2025, the Company held an earnings call to discuss the second quarter results (the "2QFY25 Earnings Call").

146. During the prepared remarks on the 2QFY25 Earnings Call, Defendant Holloman discussed the what had "changed between Q1 and Q2 and why [Vestis] did not deliver the revenue growth that [the Company] expected this quarter." Defendant Holloman admitted that the Company's revenue was "a significant difference from the growth we implied in our guidance[,]" stating, in relevant part:

> ***Second quarter revenue was $665 million, which declined approximately $18 million from Q1 or 2.7%, a significant difference from the growth we implied in our guidance.*** Excluding a $15 million onetime bad debt adjustment that Kelly will discuss, adjusted EBITDA was $63 million or 9.4% of revenue, a 250-basis point reduction compared to Q1. This decrease in margin from our lower revenue demonstrates the operating leverage inherent in our relatively fixed cost structure, which in times of revenue growth is beneficial.

> During the quarter, $7 million of decline was related to direct sales and $11 million of the decline was from our rental business, which we had expected to grow given the previous trends. While this was partially driven by lost business and excess of new business, ***the main reason for the decrease was lower adds over stops, which is how we describe volume changes with our existing customers.***

147. In discussing the impact customer credits had on the Company's revenue, Defendant Holloman stated, in relevant part:

> [W]e have taken meaningful actions to further improve revenue, including f***ocusing on decreasing the number of credits being issued to our customers. We have done this by improving specific customer service issues, such as product shortages and cleaning quality*** and have seen a positive impact from these actions on our revenue run rate in a relatively short time frame.

148. Defendant Holloman also admitted that the Company needed to "do better through serving our customers," noting, in relevant part:

> ***Let me be clear, we are disappointed with our second quarter performance***. It does not represent our long-term potential in the attractive uniform and workplace supplies market. ***We can and we will do better through serving our customers,*** executing our strategic priorities and delivering for our shareholders.

149. Defendant Holloman also reiterated the Company's focus on ""improving customer service and operational effectiveness," stating, in relevant part:

> We are moving with a sense of urgency to drive a customer-centric mindset across all levels of the organization. ***I am particularly focused on positioning our route sales representatives for success***. These teammates play a critical role as the face of Vestis to our customers. This includes enabling field service teams to deliver best-in-class service from the start with enhanced ability to solve customer issues in real time. It also means ensuring our teams can support our customers' needs by delivering high-quality products on time and in full.

150. During her own remarks on the 2QFY25 Earnings Call, the Company's CFO (at the time) Kelly Janzen ("Janzen") identified how the Company's "revenue was negatively impacted by volume-related credits issued to customers to address service concerns," also flagging

that the Company's operating cash flow was affected by a large investment in inventory so as to "support new customer installations." Specifically, Janzen stated, in relevant part:

> During the quarter, we generated $7 million of operating cash flow. However, free cash flow was $7 million negative, reflecting lower profit and higher working capital. ***The increase in working capital was primarily due to $30 million of investment in inventory to support new customer installations as well as improve our ability to serve existing customers more effectively***. This investment included $6 million of purchases we bought in anticipation of tariffs. Given current inventory levels, we do not anticipate the need to continue making significant investments over the remainder of the fiscal year.

151. Janzen also went on to note of the Company's capital expenditures that "[d]uring the quarter, we spent approximately $14 million in capital expenditures. And for the year, we expect total capital investment to be around $60 million, the majority of which is related to market center facility improvement."

152. During the question-and-answer portion of the 2QFY25 Earnings Call, Defendant Holloman stated that the Company would need to ease cost reduction efforts which were coming at the expense of "better service" for customers, stating, in relevant part:

> [W]e are continuing with our efforts around plant consolidations and better utilizing of our assets and facilities and being more efficient. So we continue that work. At the same time, we did a lot of work -- ***a lot of work was done, I should say, in the past year on cost reduction. And I'm at the point now, Andy, and I believe we're at the point where we need to settle down and really look at making absolutely sure that we are investing where we need to, to help retain customers and provide better service. So it's a fine balance there***, but we need to make absolutely sure that we're able to service our customers in a very robust, solid customer-centric kind of a focus.

153. In response to one analyst's question regarding "what really has to be done here to fix some of those things," Defendant Holloman responded, in relevant part:

> In the service area, ***we are now and what we've done over the last few weeks***, we are better organized and providing the right resources to implement both the improvements that need to be made in the plant and the improvements that we need to make in service, making sure that we have some resources that are focused on that, helping to implement and execute those improvements in the locations. And

> so that's a part of why I see it improving. Also, we've been talking a lot about culture and being focused on the customer and being customer-centric and making absolutely sure that we're doing that.
>
> The other part of it is what I often say, and I think I said it in my remarks, is that we need to be always working towards positioning our RSRs for success because they are, of course, the face of the company, and they have the relationships with the customer. And we need to make absolutely sure that they have the products with complete loads that they need to fully service the customer. And we're doing training in that area and really focused on how we can best make our RSRs successful. And so that gives me more confidence.
>
> And I understand your point around we've been working on these things. ***I would say we now have a renewed focus on making absolutely sure that we're getting these things implemented***.

154. Defendant Holloman continued, noting that the Company was starting to discuss the credits for poor service, noting "And as you noticed, we have started to talk about credits, the amount of credits that we issue. And the real opportunity there is to fix the performance issues that cause credits to happen, and that's where we're focused."

155. In response to an analyst's question regarding "on what could have caused year-over-year revenue declines" and "how much of it was due to internal issues versus evolving competitive dynamics versus macro considerations," Janzen responded by stating:

> So for ***the year-over-year revenue decline is driven by a number of things. One is we did have the lost business that did exceed the new business***. Obviously, we're narrowing that gap, but ***certainly year-over-year, that was a fairly significant factor. We also did have the adjustment -- the lower volume with existing customers. I think it's a very similar conversation as it relates to some of the service discussions that Phillip had -- service items that Phillip had, some of the credits*** and as well as potentially some of those changes in inventory demand depending on some of our mix of customers.
>
> We also had a reduction in direct sales related to the loss of that large national account we had talked about, and that had a relatively significant impact on the year-over-year. And then last year, we had some unusual positive exit billings for a couple of our customers that did not repeat this year.

> So those were the larger items that caused the year-over-year. ***I'd say we are not attributing really any of that to a macro environment change that's happened from last year to this year***.

156. On this news, in the after-market hours of May 6, 2025, the Company's stock price fell $3.27 per share, or roughly 37.5%, from a closing price of $8.71 per share on May 6, 2025 to close at $5.44 per share on May 7, 2025.

## THE INDIVIDUAL DEFENDANTS' KNOWLEDGE

157. Throughout the Relevant Period, the Individual Defendants were aware of the Company's continued operational failures and the resultant negative impact on customer satisfaction such that they knew or consciously disregarded the true extent of the materially false and/or misleading statements regarding the quality of the Company's customer service.

158. For example, CW2 recalled how senior leadership would visit the Company's facilities and witness the backlog for themselves. Specifically, CW2 reported that the Regional Vice President, Nanci Humsinger, visited the Company's Chicago facility at least once every week or every other week. CW2 also reported that the Company's Vice President of Field Operations, Paul Schmid, visited around the holiday rush in May 2024 and saw the materials piled up outside, with Schmid's response being, "holy shit . . . everybody, I want them in the conference room in forty-five minutes. I didn't realize it was this bad." CW2 recollected his response was that "we're not a mom-and-pop shop, Paul. I think we need every available washer in our network processing material."

159. The Confidential Witnesses also confirmed that the Company held weekly calls to discuss the Company's operations across all of its regions and to discuss efficiency data compiled in Tableau. Notably, the Confidential Witnesses revealed that Defendant Scott would access Tableau and receive weekly productivity reports that reflected the data discussed on the calls.

160. According to CW2, the Company's executive management, including Defendant Scott, had "full visibility into plant operations," both "daily and weekly." CW2 revealed that you could see who was in Tableau at a given time, noting that "no less than two, no more than four times Kim Scott's name would be in there."

161. Similarly, CW4 revealed that he prepared weekly productivity reports to be sent to the District Operations Manager, who would then compile data from multiple plants into a regional spreadsheet. CW4 also confirmed Defendant Scott would receive the reports, because the District Operations Manager "made it very clear" that the reports were sent to her, noting that "'hey, Kim Scott is looking at these numbers. She wants to see improvement.'"

162. Moreover, CW1 confirmed that the Company's senior leadership were able to see customer complaints, noting that "every manager had access." CW1 even noted that some complaints were marked for "Office of the President" or "OOP," i.e. Defendant Scott. CW1 claimed that a daily email would track service requests, including those that were marked as "OOP".

163. The Individual Defendants were also aware of the number of credits the Company was issuing to dissatisfied customers. CW2 recalled a weekly "state of business" call every Wednesday, led by Regional Vice President Nanci Humsinger, which "was a 95% sales call and a 5% operations all." CW2 noted that national accounts would get flagged, noting that leadership "would bring it up and say, hey, the plants need to start watching Cheesecake Factory. Sales, please go give them some love."

164. CW2 also noted that customer problems would frequently trigger "all-points bulletin," or APB calls with the general manager of sales. CW2 stated that "if somebody was complaining they weren't getting all their rugs or napkins or uniforms, and the general manager

deemed it needed an APB call, you would have this call," noting that this occurred as frequently as "once a week, twice a week."

165. As noted above, the amount of credits being issued to customers also prompted Defendant Scott to change the credit policy in November 2024, requiring a full credit review process which resulted in final approval of the credits only being done by Defendant Scott or the Company's Chief Operating Officer themselves. Similarly, Defendant Scott must have been aware of the number of contract deviations being requested as only she could approve such deviations.

166. According to the Confidential Witnesses, Defendant Scott would lead Town Hall meetings throughout the Relevant Period in which she would present sales, retention and customer satisfaction data to, *inter alia*, senior leadership and managers.

167. CW4 explained that Defendant Scott would lead these Town Hall meetings "99% of the time," estimating that there would be "anywhere from three to 500 people" in attendance. CW4 also reported that the data presented at the Town Hall meetings was specific sales and customer retention figures "by region" and "the overall numbers for the company as a whole." CW4 noted that "all of it had documentation behind it."

168. CW4 also revealed that by the end of 2024, the tone of the monthly Town Hall meetings was not positive. CW4 recalled that in the October and November 2024 Town Halls that the Company was missing its targets, stating "'here's the number we promised our investors. Here's where we're projected to be. We're not going to meet that.'"

169. CW4 also revealed that Defendant Scott provided customer satisfaction metrics at the Town Halls, which would be measured on a scale of 1-10, with an 8 representing the customer was satisfied. CW4 said that the satisfaction score "was dependent on however many customers rated you at an eight or above." CW4 noted that the Company consistently fell short of achieving

a benchmark of two-thirds of the Company's customers providing a satisfactory score, and that towards the end of his tenure, there was never "a significant jump in customer satisfaction."

170. Notably, CW4 also stated that customer satisfaction was not even a priority for the Company until the second half of 2024, noting that the Company "didn't really focus on customer retention a whole lot until it was too late." CW4 stated that before then, the Company's attitude was more akin to "oh we lost this customer, go get another."

171. Defendant Scott and other Individual Defendants' public statements also support that they knew about the significant issues facing the Company. For example, on the May 2, 2024 earnings call, Defendant Scott claimed:

> We also see opportunities around things like shortages, that are making sure that we have a process to verify that the truck has been loaded accurately and that all of the product that needs to go to our customer is, in fact, being delivered to our customer. So those are opportunities around the perfect truck and loading processes, and we've got folks out in the field now working through programs to address those things.
>
> So we feel very confident that we've isolated these challenges and opportunities, and we have very clear, deliberate actions around specific things like on-time delivery and stopping shortages and delivering full loads to customers. The great news is that our culture is in a great place as it relates to wanting to do a great job for the customer and our teammates are serving our customers really well as it relates to the relationship and the experience.

172. On an August 9, 2024 earnings call, Defendant Scott claimed that she and others spent time at a Greenville, South Carolina facility "mapping out their process of how they manage shortages" and claimed that they were working to ensure that "all the plants have enough buffer stock and that we're ordering on time and we're delivering on time and that, that product is available for customers."

173. On a November 21, 2024 earnings call, Defendant Scott claimed:

> And then lastly, we called out shortages, making sure every piece of product got on the truck and delivered to the customer as needed. And we also have now been

testing a new procedure for our facilities to follow. In our pilot locations, we've seen a 50% improvement in reducing shortages just in the pilot locations. So that will be rolled out over the course of the year as well. So all in, I can tell you that great things are happening here at Vestis for our customers, and we've got leadership and processes to underpin that. So I feel really good about where we are.

174. On a January 31, 2025 earnings call, Defendant Scott claimed:

> Yes. Great question. So we really look at NPS at the most macro level on an annual basis. So we'll come back to that and talk about that annually. But we look every day at leading indicators around service related requests. So as a customer calls in with a service need of some sort, we call those SRs, and we manage service requests on a very tactical and daily basis. And those service requests have very specific reason codes attached to them. And those reason codes help us generate Pareto bars and understand what are the key drivers of customer service requests.
>
> You might recall in the past, I spoke about those, and I specifically called out ontime delivery and shortages as being key opportunities to improve the customer experience and to reduce those service requests. And I'm really proud to say that we are reducing those service requests related to those key Pareto bars in those key areas around on-time delivery and around shortages. So overall, we areseeing continued improvement in the customer experience, and we can see that daily in the reduction of service requests related to these key focus areas. And also, I will add some more color around that, Andrew, is we're seeing great success cross-selling our existing customers multiple products and services. And that is also a great indicator that our customers are having a good experience because they're choosing to buy more from Vestis.
>
> ---
>
> So I'll point you back to all of the efforts that we really undertook really in the second quarter of last year, shifting the team to focus very aggressively on enhancing the customer experience. And so we have been hyper focused as a team on really driving a delightful experience for our customers from on-time performance to rolling out standard operating procedures to improve shortages and to make sure our customers get everything they want the first time that it's delivered and really shifting our team's focus around delighting the customer. We are definitely seeing that, that body of work is making a difference, and we are seeing improvements in service requests and our customers are responding very positively to the work that we are doing to take great care of them. So I would point to that as the key reason around why our customers are staying.

## **THE SECURITIES CLASS ACTION**

175. As a result of the misconduct alleged herein, a securities class action was filed against Vestis, Defendant Scott, and Rick Dillon ("Dillon"), the Company's Chief Financial Officer. The Securities Class Action asserts claims under Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10B-5 due to false and misleading statements about how Vestis's long standing operational and customer service issues were improving while systemic problems persisted.

176. On July 31, 2026, the court issued the MTD Order, denying defendants' motion to dismiss in part. The court found that the plaintiff in the Securities Class Action did not properly plead its claims as to Dillon and concluded that a number of challenged statements were non-actionable statements, as they were, among others, "forward-looking statements accompanied by meaningful cautionary language," or puffery or opinion statements. However, despite this, the court ruled that three statements that Defendant Scott made regarding purported improvements to Vestis's operations were actionable and material.

177. The court held that it "cannot conclude that the three remaining misstatements are obviously unimportant to a reasonable investor in light of the Company's disclosures because these three statements do not merely suggest that Vestis was working on its problems. Rather, a reasonable investor could understand these statements to suggest that Vestis's customer service and operational problems had improved on a company-wide basis. And the suggestion that Vestis had improved its customer service and operational problems wholesale, is contradicted by the CWs' well-pleaded allegations." MTD Order at 71.

178. The court also held that the plaintiff in the Securities Class Action "adequately pleaded a strong inference of scienter" under the heightened PSLRA standard that Defendant Scott "was aware of contrary information when she made the actionable Challenged Statements." MTD Order at 75. In determining that the plaintiff adequately plead scienter, the court cited to statements

Defendant Scott had made herself about "closely and personally monitoring metrics regarding customer experience, service, and retention" and spending "significant amount of time" meeting with Vestis's sales team and Vestis's Greenville, South Carolina facility where she "spent a couple of days on the ground. . . mapping out their process of how they manage shortages." *Id.* at 75-77. The court also cited to CWs who recounted that Defendant Scott "was personally informed of Vestis's continued problems with product shortages and low morale." *Id.* at 76. Based on these and other facts, the court concluded that it was "a reasonable inference that she had access to and was informed about Vestis's lack of improvement with respect to its operational and customer services problems." *Id*. The court also found that allegations that the misstatements concerned Vestis's "core operations. . . bolster[ed] an inference of scienter." *Id*. at 80. Because the plaintiff in the Securities Class Action pleaded a Section 10(b) claim, the court denied the motion to dismiss as to the Section 20(a) claim as well. *Id*. at 82.

## <u>DAMAGES TO VESTIS</u>

179. As a direct and proximate result of the Individual Defendants' conduct, Vestis has incurred and will continue to incur substantial costs and expenses.

180. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection therewith.

181. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on any misconduct alleged herein and amounts paid to outside lawyers, accountants, and investigators in connection therewith.

182. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

183. As a direct and proximate result of the Individual Defendants' conduct, Vestis has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the misrepresentations alleged herein.

## DERIVATIVE ALLEGATIONS

184. Plaintiff brings this action derivatively and for the benefit of Vestis to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Vestis, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of Sections 14(a), 10(b) and 21D of the Exchange Act.

185. Vestis is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

186. Plaintiff is, and has been at all relevant times, a shareholder of Vestis. Plaintiff will adequately and fairly represent the interests of Vestis in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

187. Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

188. A pre-suit demand on the Board of Vestis is futile and, therefore, excused. At the time of filing of this amended complaint, the Board consists of the following ten individuals: Defendants Holloman, Burke, Goetz, Jokinen, McKee, Meister, Pertz, Whitney, Williams (the "Director Defendants"), and non-party Jim Barber, Jr. ("Barber") (together with the Director Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to five of the ten Directors that were on the Board at the time of the filing of this amended complaint.

189. Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to cause the Company to make false and misleading statements and omissions of material fact, which renders the Director Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the schemes.

190. In complete abdication of their fiduciary duties, the Director Defendants either knowingly participated in causing the Company to make the materially false and misleading statements alleged herein and/or consciously disregarded the risks of same. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. Moreover, the Director Defendants caused the Company to fail to maintain adequate internal controls. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

191. Demand on Defendant Holloman is futile for the following additional reasons: Defendant Holloman has served as a Company director and as the Chairman of the Board since the Spinoff. Defendant Holloman currently serves as a member of the Nominating, Governance, and Corporate Responsibility Committee. Additionally, Defendant Holloman served as the interim

Executive Chairman, President and CEO from March 18, 2025 to June 1, 2025 (during this period, Defendant Holloman temporarily stepped down from his position on the Nominating, Governance, and Corporate Responsibility Committee). Thus, Defendant Holloman is not an independent director. Defendant Holloman has received and continues to receive compensation for his role as a director as described above. As a trusted Company director and as the Chairman of the Board, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Moreover, Defendant Holloman solicited the false and misleading 2024 Proxy Statement, which led to shareholders voting, *inter alia*, to reelect Defendants Goetz, McKee, Meister, and Pertz to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Holloman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

192. Demand on Defendant Burke is futile for the following additional reasons: Defendant Burke has served as a Company director since the Spinoff. Defendant Burke also serves as the Chair of the Board's Nominating, Governance, and Corporate Responsibility Committee and as a member of the Compensation and Human Resources Committee. Defendant Burke has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Moreover, Defendant Burke solicited the false and misleading 2024

Proxy Statement, which led to shareholders voting, *inter alia*, to reelect Defendants Goetz, McKee, Meister, and Pertz to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Burke breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

193. Demand on Defendant Goetz is futile for the following additional reasons: Defendant Goetz has served as a Company director since August 3, 2024. Defendant Goetz also serves as a member of the Nominating, Governance, and Corporate Responsibility Committee. Defendant Goetz has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Moreover, Defendant Goetz solicited the false and misleading 2024 Proxy Statement, which led to shareholders voting, *inter alia*, to reelect Defendants McKee, Meister, Pertz, and himself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Goetz breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

194. Demand on Defendant Jokinen is futile for the following additional reasons: Defendant Jokinen has served as a Company director since the Spinoff. Defendant Jokinen also serves as the Chair of the Board's Audit Committee and as a member of the Compensation and Human Resources Committee. Defendant Jokinen has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she

conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. Moreover, Defendant Jokinen solicited the false and misleading 2024 Proxy Statement, which led to shareholders voting, *inter alia*, to reelect Defendants Goetz, McKee, Meister, and Pertz to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Jokinen breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

195. Demand on Defendant McKee is futile for the following additional reasons: Defendant McKee has served as a Company director since the Spinoff. Previously, Defendant McKee served as Executive Vice President and Chief Human Resources Officer for Aramark from 2004 until 2022. Thus, as the Company admits, Defendant McKee is not independent. Defendant McKee has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. Moreover, Defendant McKee solicited the false and misleading 2024 Proxy Statement, which led to shareholders voting, *inter alia*, to reelect Defendants Goetz, Meister, Pertz, and herself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant McKee breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

196. Demand on Defendant Meister is futile for the following additional reasons: Defendant Meister has served as a Company director since June 18, 2024. Defendant Meister currently serves as a member of the Audit Committee. Defendant Meister has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Moreover, Defendant Meister solicited the false and misleading 2024 Proxy Statement, which led to shareholders voting, *inter alia*, to reelect Defendants Goetz, McKee, Pertz, and himself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Meister breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

197. Demand on Defendant Pertz is futile for the following additional reasons: Defendant Pertz has served as a Company director since the Spinoff. Defendant Pertz also serves as the Chair of the Board's Compensation and Human Resources Committee and as a member of the Audit Committee. Defendant Pertz has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Moreover, Defendant Pertz solicited the false and misleading 2024 Proxy Statement, which led to shareholders voting, *inter alia*, to reelect Defendants Goetz, McKee, Meister, and himself to the Board, thereby

allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Pertz breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

198. Demand on Defendant Whitney is futile for the following additional reasons: Defendant Whitney has served as a Company director since the Spinoff. Defendant Whitney also serves as a member of the Audit Committee. Defendant Whitney has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. Moreover, Defendant Whitney solicited the false and misleading 2024 Proxy Statement, which led to shareholders voting, *inter alia*, to reelect Defendants Goetz, McKee, Meister, and Pertz to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Whitney breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

199. Demand on Defendant Williams is futile for the following additional reasons: Defendant Williams has served as a Company director since the Spinoff. Defendant Williams also serves as a member of the Compensation and Human Resources Committee and the Nominating, Governance, and Corporate Responsibility Committee. Defendant Williams has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls

over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. Moreover, Defendant Williams solicited the false and misleading 2024 Proxy Statement, which led to shareholders voting, *inter alia*, to reelect Defendants Goetz, McKee, Meister, and Pertz to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Williams breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

200. Demand on non-party Barber is futile for the following additional reasons: Barber is neither disinterested nor independent, and therefore, is incapable of considering demand because he, as the Company's CEO, is an employee of the Company, and thus derives substantially all of his income from his employment with Vestis, thereby rendering him not independent. Moreover, the Company notes in its SEC filings that Barber is not an independent director. As such, Barber could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Barber is therefore futile.

201. In the event the Court determines that demand futility should be analyzed with respect to the membership of the Company's Board on July 29, 2025 (the "Initial Board"), the date that this action was initiated, demand would nonetheless be excused as futile.[3]

202. A pre-suit demand on the Initial Board is futile and, therefore, excused. At the time of filing on July 29, 2025, the Initial Board consisted of the following ten individuals: the Directors. Plaintiff needs only to allege demand futility as to five of the ten Directors that were on the Initial Board.

[3] Demand futility is examined with respect to the membership of the Board at the time the amended complaint is filed unless the asserted claims are "validly in litigation" at the time of the original complaint. *Braddock v Zimmerman*, 906 A.2d 776, 778-79 (Del. 2006).

203. Additional reasons that demand on the Board is futile follow.

204. Defendants Jokinen (as chair), Meister, Pertz, and Whitney, served as members of the Audit Committee during the Relevant Period. In violation of the Audit Committee Charter, Defendants Jokinen, Meister, Pertz, and Whitney failed to adequately review and discuss the Company's press releases; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct and Code of Ethics. Thus, Defendants Jokinen, Meister, Pertz, and Whitney further breached their fiduciary duties, are not disinterested, and demand is excused as to them.

205. In violation of the Code of Conduct and Code of Ethics, the Director Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Sections 14(a), 10(b) and 21D of the Exchange Act. In violation of the Code of Conduct and Code of Ethics, the Director Defendants failed to avoid conflicts of interest or the appearance of conflicts of interest; maintain the accuracy of Company records; protect and ensure the efficient use of Company assets; comply with all applicable laws, rules, and regulations, and properly report violations of the Code of Conduct and Code of Ethics and applicable laws, rules, and regulations. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

206. Vestis has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to

recover for Vestis any part of the damages Vestis suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

207. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

208. The acts complained of herein constitute violations of fiduciary duties owed by Vestis's officers and directors, and these acts are incapable of ratification.

209. The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Vestis. If there is a directors' and officers' liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of Vestis, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the

Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

210. If there is no directors' and officers' liability insurance, then the Director Defendants will not cause Vestis to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

211. Thus, for all of the reasons set forth above, all of the Director Defendants, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

**FIRST CLAIM**

**Against Defendants Scott, Burke, Goetz, Holloman, Jokinen, McKee, Meister, Pertz, Whitney, and Williams for Violations of Section 14(a) of the Exchange Act**

212. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

213. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

214. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or

which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

215. Under the direction and watch of Defendants Scott, Burke, Goetz, Holloman, Jokinen, McKee, Meister, Pertz, Whitney, and Williams, the 2024 Proxy Statement failed to disclose, *inter alia*, that: (1) the operational deficiencies and product shortages the Company was experiencing prior to the start of the Relevant Period were not improving; (2) these issues caused the Company to delay new customer installations and prevented the Company from properly servicing its existing customers; and (3) the resulting customer dissatisfaction resulted in customers seeking credits, lowering invoice minimums, and pursuing cancellations, deviations, and buyouts. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

216. The 2024 Proxy Statement also failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct and Code of Ethics, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

217. In the exercise of reasonable care, Defendants Scott, Holloman, Burke, Goetz, Jokinen, McKee, Meister, Pertz, Whitney, and Williams should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy Statement were materially false and misleading. The misrepresentations and omissions

were material to Plaintiff in voting on matters set forth for shareholder determination in the 2024 Proxy Statement including, but not limited to the election of directors.

218. As a result of Defendants Scott, Holloman, Burke, Goetz, Jokinen, McKee, Meister, Pertz, Whitney, and Williams causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted to, *inter alia*, to: (1) reelect Defendants Goetz, McKee, Meister, and Pertz to the Board, thereby allowing them to continue to breach their fiduciary duties to Vestis; (2) approve, on an advisory basis, named executive officer compensation; (3) approve, on an advisory basis, the frequency of future advisory votes to approve named executive officer compensation; and (4) ratify the appointment of Deloitte & Touche LLP as the Company's independent registered public accounting firm.

219. The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2024 Proxy Statement.

220. Plaintiff, on behalf of Vestis, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

221. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

222. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Vestis's business and affairs.

223. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

224. The Individual Defendants' conduct set forth herein was due to their intentional or breach of the fiduciary duties they owed to the Company and/or conscious disregard of same, as

alleged herein. The Individual Defendants intentionally breached or consciously disregarded their fiduciary duties to protect the rights and interests of Vestis.

225. In breach of their fiduciary duties owed to Vestis, the Individual Defendants willfully caused or allowed the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the operational deficiencies and product shortages the Company was experiencing prior to the start of the Relevant Period were not improving; (2) these issues caused the Company to delay new customer installations and prevented the Company from properly servicing its existing customers; and (3) the resulting customer dissatisfaction resulted in customers seeking credits, lowering invoice minimums, and pursuing cancellations, deviations, and buyouts. In light of the above, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

226. The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

227. The Individual Defendants had actual knowledge that they had caused the Company to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that internal controls were not adequately maintained, or acted with conscious disregard for the truth, in that they caused the Company to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or in bad faith and for the purpose and effect of artificially inflating the price of Vestis's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

228. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

229. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Vestis has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

230. Plaintiff, on behalf of Vestis, has no adequate remedy at law.

**THIRD CLAIM**
**Against Individual Defendants for Unjust Enrichment**

231. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

232. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Vestis.

233. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Vestis that was tied to the performance or artificially inflated valuation of Vestis or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

234. Plaintiff, as a shareholder and a representative of Vestis, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

235. Plaintiff, on behalf of Vestis, has no adequate remedy at law.

**FOURTH CLAIM**
**Against Individual Defendants for Abuse of Control**

236. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

237. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Vestis, for which they are legally responsible.

238. As a direct and proximate result of the Individual Defendants' abuse of control, Vestis has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Vestis has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

239. Plaintiff, on behalf of Vestis, has no adequate remedy at law.

**FIFTH CLAIM**
**Against Individual Defendants for Gross Mismanagement**

240. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

241. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Vestis in a manner consistent with the operations of a publicly held corporation.

242. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Vestis has sustained and will continue to sustain significant damages.

243. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

244. Plaintiff, on behalf of Vestis, has no adequate remedy at law.

**SIXTH CLAIM**
**Against Individual Defendants for Waste of Corporate Assets**

245. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

246. The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

247. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Vestis to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

248. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

249. Plaintiff, on behalf of Vestis, has no adequate remedy at law.

**SEVENTH CLAIM**
**Against Defendant Scott for Contribution**
**Under Sections 10(b) and 21D of the Exchange Act**

250. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

251. Vestis and Defendant Scott are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is

found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Scott's willful and/or reckless violations of her obligations as an officer and/or director of Vestis.

252. Defendant Scott, because of her position of control and authority as an officer and director of Vestis, was able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Vestis, including the wrongful acts complained of herein and in the Securities Class Action.

253. Accordingly, Defendant Scott is liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

254. As such, Vestis is entitled to receive all appropriate contribution or indemnification from Defendant Scott.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Vestis, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Vestis;

(c) Determining and awarding to Vestis the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing Vestis and the Individual Defendants to take all necessary actions

to reform and improve Vestis's corporate governance and internal procedures to comply with applicable laws and to protect Vestis and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Vestis to nominate at least five candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e) Awarding Vestis restitution from the Individual Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: September 1, 2026

Respectfully Submitted,

**THE BROWN LAW FIRM, P.C.**

*<u>/s/ Timothy Brown</u>*
Timothy Brown
Saadia Hashmi

1350 Avenue of the Americas, Suite 1200
New York, NY 10019
Telephone: (516) 922-5427
Email: tbrown@thebrownlawfirm.net
Email: shashmi@thebrownlawfirm.net

# VERIFICATION

I, Michael Gribe, am a plaintiff in the within action. I have reviewed the allegations made in this Amended Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 21st day of August, 2026.

DocuSigned by:

5FB460828B5D439...

Michael Gribe